**UNITED STATES of America**

v.

**Willie ROBINSON, Jr., Appellant.**

**No. 23734.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 1, 1972.

Decided Oct. 31, 1972.

Certiorari Granted March 19, 1973.
See 93 S.Ct. 1500.

Mr. Joseph Gartlan, Jr., Washington, D. C., with whom Mrs. Dorothy Sellers, Washington, D. C. (both appointed by this court), and Mr. John K. Crummey, Bethesda, Md., were on the brief, for appellant.

Mr. Henry F. Greene, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry and John F. Evans, Asst. U. S. Attys., were on the brief, for appellee. Messrs. Harold H. Titus, Jr., present U. S. Atty., and Earl J. Silbert, Asst. U. S. Atty., also entered appearances for appellee.

Mr. Scott R. Schoenfeld, Washington, D. C., filed a brief on behalf of Americans for Effective Law Enforcement, Inc. as amicus curiae.

## ON REHEARING EN BANC

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting *en banc.*

J. SKELLY WRIGHT, Circuit Judge:

This appeal from a jury conviction of federal narcotics offenses [1] raises questions under the Fourth Amendment, as difficult as they are important, concerning the permissible scope of a search of the person incident to a lawful arrest for violation of a District of Columbia motor vehicle regulation. The case was heard initially by a division of this court which reversed the conviction, one judge dissenting, on the ground that the search of appellant's person violated the commands of the Fourth Amendment. Upon rehearing *en banc,* however, the court vacated the opinion and judgment of the division and held that since the taking of evidence in the District Court had not focused upon the scope issue relied upon by the division, a remand was necessary in order that "an authentic version of what actually happened" might be presented.[2] This supplemental evidentiary hearing having now been completed, we find the search of appel-

---

1. Appellant was convicted of possession of narcotic drugs under 26 U.S.C. § 4704(a) (1964) and of receipt and concealment of narcotic drugs under 21 U.S.C. § 174 (1964). Both of these acts, it should be noted, have since been repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* (1970).

2. United States v. Robinson, 145 U.S.App. D.C. 46, 54, 447 F.2d 1215, 1223 (1971) (*en banc*). The court pointed to several factual voids in the record as it then existed. Specifically, the court sought clarification as to (1) whether the search could be justified on an "in plain view" theory; (2) whether there existed any evidentiary basis for the search; (3) whether and to what extent the searching officer continued his search after discovering the narcotics; and (4) whether the search actually conducted was consistent with Metropolitan Police Department practices. The evidence adduced on these issues will be discussed at appropriate sections of this opinion *infra.*

In addition to the scope issue, appellant argued that (1) a 16-month delay between his arrest and trial resulted in a deprivation of his right to a speedy trial under the 6th Amendment, and (2) the Government failed at trial to establish a continuous chain of custody of the narcotics admitted in evidence against him. The original opinion of the division pretermitted these issues, but upon rehearing *en banc* the court resolved both questions for the Government. *See* 145 U.S.App.D.C. at 50–52, 447 F.2d at 1219–1221.

lant to be unconstitutional and therefore reverse the conviction.

I

On April 19, 1968, Officer Richard Jenks of the Metropolitan Police Department stopped a 1965 Cadillac at the intersection of Ninth and U Streets, N.W., for a "routine spot check." At the time of this stop, Officer Jenks examined not only appellant's temporary operator's permit and automobile registration card, but also his selective service classification card. Officer Jenks permitted appellant to continue about his business, but only after making notes of the three items. His note taking alerted him to a discrepancy between the "1938" date of birth listed on the temporary operator's permit and the "1927" date of birth listed on the selective service classification card. Officer Jenks then went to police traffic records and discovered that the operator's permit issued to "Willie Robinson, Jr.," born in 1927, had been revoked, and that a temporary permit had been issued to a "Willie Robinson," born in 1938.[3] The pictures on the revoked permit and on the application for the temporary permit were of the same person; both were likenesses of the man he had stopped for the routine check on April 19.

On April 23, 1968, while on duty, Officer Jenks observed appellant operating the same vehicle. He stopped appellant, asked him for his permit and registration card and, upon being shown the same permit appellant had exhibited four days earlier, placed appellant under arrest for operating a motor vehicle after revocation of his operator's permit and for obtaining a permit by misrepresentation. According to his testimony at the remand hearing, Officer Jenks then advised appellant of his rights and proceeded to search him. Since the arrest was one which involved taking appellant to the station house,[4] under Police Department instructions Officer Jenks was required to make a full field search as an incident to the arrest.[5] A full field search "is a thorough search of the individual." Remand transcript at 99. "He examines the contents of all of the pockets in a field type search and in-custody arrest at all times." Id. at 120. In conducting a full field search, "even though [the officer] may feel something that he believes is not a weapon, he is instructed to take it out." Id. at 100. The officer is taught "to examine everything he has on him at the field search. Everything that we find in his pockets is examined to find out what exactly it is." Id. at 104.

3. A significant difference in presentation of the facts, or at least in emphasis given the facts, by the opposing parties, centers on the further check by Officer Jenks of "criminal records" which occurred after he had checked "traffic records." Counsel for appellant on appeal stressed that appellant had a record of 2 prior narcotics convictions, and suggested that Officer Jenks may have been aware of appellant's record through his investigation of "criminal records." Thus appellant urges that Officers Jenks may have used the subsequent traffic violation arrest as a mere pretext for a narcotics search which would not have been allowed by a neutral magistrate had Officer Jenks sought a warrant. Were this claim to be established, the search would clearly be illegal under the authority of United States v. Lefkowitz, 285 U.S. 452, 467, 52 S.Ct. 420, 76 L.Ed. 877 (1932); Amador-Gonzalez v. United States, 5 Cir., 391 F.2d

308 (1968); Taglavore v. United States, 9 Cir., 291 F.2d 262 (1961). Officer Jenks, however, denied that he had any such motive or strategy to evade the normal 4th Amendment protections. For purposes of this opinion, we accept the Government's version of this factual question since, even accepting this version, we find the search to be unconstitutional.

4. See note 23 infra.

5. Testimony of Sergeant Donaldson, remand tr. at 99, reads:
 Q Now, directing your attention to the field type search. When is a field search instructed to be conducted by a police officer?
 A At any time he makes a full custody arrest. That is where he would arrest a subject and subsequently transport him to a police facility for booking

■ Officer Jenks' search complied with Police Department instructions. He was unable to recall the precise sequence in which he searched appellant. His best recollection was that in placing his right hand on appellant's left breast he felt an object.[6] Although Officer Jenks could not ascertain the precise size or consistency of this object, there was no suggestion that he believed it to be a weapon or believed himself to be in danger. On the contrary, he admitted that he did not have any specific purpose in mind when he searched appellant: "I just searched him. I didn't think about what I was looking for. I just searched him." Remand transcript at 32. Officer Jenks proceeded to extract the object—which turned out to be a wadded up cigarette package—from appellant's pocket. He then opened the package and found it to contain 14 gelatin capsules of heroin. Officer Jenks then placed appellant under arrest for possession of narcotics, and continued his search without finding any weapons or any additional narcotics.[7]

■ Throughout the proceedings in this case, the Government has consistently conceded,[8] and indeed there can be no doubt, that in extracting the cigarette package from appellant's pocket and opening the package so as to examine its contents, Officer Jenks exceeded the permissible scope of a limited *frisk* for weapons.[9] Moreover, as Officer

---

6. Remand tr. at 24. At the hearing on appellant's motion to suppress, Officer Jenks testified that he "searched [appellant] immediately in front of me. I noticed in his left coat pocket—breast pocket of his coat, a wadded up package—cigarette package. I opened it. Inside was [*sic*] found 14 gelatin capsules." Similarly, at trial Officer Jenks stated that "I searched him in front of me. He had a jacket on. In his left coat pocket—jacket pocket was a wadded up cellophane packet containing 14 gelatin capsules which contained white powder."

7. Officer Jenks was unable to recall the precise sequence in which he continued to search appellant. The relevant features of the search, however, included a search around appellant's waistline and down his trouser legs and into his pockets. Officer Jenks testified that he was too embarrassed to examine appellant's groin area. If the initial search, which disclosed the 14 gelatin capsules, was valid under the 4th Amendment, these further intrusions upon appellant's privacy would also be reasonable since at that point Officer Jenks would have been justified in conducting a full search of appellant's person incident to the narcotics arrest in order to prevent destruction or concealment of any additional evidence.

8. In its petition for rehearing and suggestion for rehearing *en banc*, for example, the Government concedes that "Officer Jenks did in fact conduct a search of appellant by examining the left breast pocket of his outer coat and did not limit himself to a mere patdown." *See also* appellee's brief at 8-9; appellee's supplemental memorandum at 31-34.

9. *See* Terry v. Ohio, 392 U.S. 1, 16 n. 12, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and accompanying text. A protective frisk for weapons may, of course, evolve into a full search of the suspect's pockets if the suspicions of the frisking officer are reasonably aroused. This is precisely the 2-step "search" procedure approved by the Supreme Court in *Terry*, where the arresting officer "did not place his hands in [the suspect's] pockets or under the outer surface of [his] garments *until* he had felt weapons * * *." *Id.* at 29-30, 88 S.Ct. at 1884. (Emphasis added.) Thus it has been clear since *Terry* that a frisking officer may not remove an object from the suspect's pockets unless "he *reasonably* believes [it] to be a dangerous weapon * * *." American Law Institute, Model Code of Pre-Arraignment Procedure § 110.2(4) (Proposed Official Draft No. 1, 1972). (Emphasis added.) *See* Sibron v. New York, 392 U.S. 40, 65, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

In the instant case, however, there is no evidence whatever that Officer Jenks believed the object in appellant's pocket to be a weapon. On the contrary, Officer Jenks admitted that he did not have any specific purpose in mind when he searched appellant: "I just searched him. I didn't think about what I was looking for. I just searched him." This testimony, and the fact that Officer Jenks did not limit himself to a frisk, is clearly corroborated by the testimony of Police Sergeant Dennis Donaldson, an instructor at the District of Columbia Police Training Division, to the effect that it is standard Metropolitan Police Department procedure in cases such as this to conduct

Jenks' testimony at the remand makes clear, the *full* search of appellant's person that actually occurred in this case cannot be justified on a theory that the narcotics were "in plain view." [10] Thus the question is now squarely presented whether, and under what circumstances, an arresting officer may conduct a *full* search of the person incident to a lawful arrest for violation of a mere motor vehicle regulation.[11]

## II

██ Ordinarily, a warrant must be obtained by a police officer before he may make a search.[12] Searches of both

---

a *full* search of the person rather than a mere patdown for weapons.

Moreover, even if Officer Jenks believed the object to be a weapon, it is doubtful that such a belief could be upheld as reasonable. Although Officer Jenks could not determine precisely how hard or how large the object was before removing it from appellant's pocket, he readily admitted that it felt smaller, softer and less suspicious than even a small derringer. Indeed, Sergeant Donaldson made clear that an object such as a wadded up cigarette package ordinarily should *not* be removed from a suspect's pocket in the course of a properly conducted frisk. *See* Tinney v. Wilson, 9 Cir., 408 F.2d 912 (1969); United States v. Gonzalez, D.Conn., 319 F.Supp. 563 (1970); United States v. Hostetter, D.Del., 295 F.Supp. 1312 (1969).

Finally, even if Officer Jenks' decision to extract the cigarette package from appellant's pocket could be sustained as part of a valid frisk, he still would not have been justified in opening the package so as to examine its contents. When the sole interest of the frisking officer is to deprive the suspect of weapons, and the officer reasonably believes that an object in the suspect's possession may *contain* a weapon, the officer's interest in self-protection can be fully and completely vindicated simply by placing the "container" beyond the suspect's reach until the encounter has ended. There is no need whatever for the officer to open the "container" to examine its contents. *See, e. g.,* United States v. Collins, 142 U.S.App. D.C. 100, 108, 439 F.2d 610, 618 (1971); United States v. Hostetter, *supra*; Amacher v. Superior Court, 1 Cal.App.3d 150, 81 Cal.Rptr. 558 (1969); American Law Institute, *op. cit. supra*, Comment on § 110.2 at 119; LaFave, "Street Encounters" and the Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich.L. Rev. 40, 90 (1968). Indeed the regulations of the Metropolitan Police Department state clearly that if, in the course of a frisk, "the individual has a parcel, the officer is justified only in placing it beyond the individual's reach and not in opening it." Metropolitan Police Department,

Guidelines for the Exercise of the Authority to Stop and Frisk (Aug. 27, 1969).

The only exception to this rule arises where the officer, upon discovering the "container," has probable cause to believe it contains illegal contraband. At that point, the officer may place the individual under arrest for the possession offense and then examine the contents of the "container" in the exercise of his authority to conduct a full search of the person incident to that arrest. In the instant case, however, it is clear that Officer Jenks did not arrest appellant for the possession offense, and did not have probable cause to make such an arrest, until after he had opened the cigarette package. Indeed, Officer Jenks admitted that he did not know what was in the package until after he had opened it. Thus for any one of the reasons stated above we must conclude that Officer Jenks did not limit himself to a mere frisk for weapons, but rather conducted a full search of appellant's person.

10. Officer Jenks testified at the hearing on remand that he could not see the cigarette package through the breast pocket of appellant's coat, that he could not see into the pocket, and that he could not see the 14 gelatin capsules until he had actually opened the package.

11. There can be no doubt that appellant was lawfully arrested for operating a motor vehicle after revocation of his driver's permit and for obtaining a new permit by misrepresentation. These offenses are defined, respectively, by statute and ordinance. *See* 40 D.C.Code § 302(d) (1967); Traffic Regulations of the District of Columbia § 157(e). The former is subject to punishment by a fine of $100 to $500, or imprisonment from 30 days to one year, or both. The latter carries a fine of not more than $300 or 10 days in jail. *See* note 23 *infra*.

12. The Supreme Court has recently held warrants to be such an important element of Fourth Amendment protection that "searches conducted outside the judicial process, without prior approval by

person and place incident to lawful arrest, however, have traditionally been exceptions to this rule and have been held constitutional even though they have been made without prior approval by a neutral magistrate. Nevertheless, "the bare fact that a person is validly arrested does not mean that he is subject to any and all searches that the arresting officer may wish to conduct." United States v. Mills, 153 U.S.App.D.C. ——, ——, 472 F.2d 1231, 1234 (decided May 10, 1972) (*en banc*). Rather, the validity of searches and seizures under the Fourth Amendment turns upon their reasonableness, and since a warrant will not be available to insure that arrest based searches are reasonable both at their inception and in their execution, courts must review the constitutionality of such searches with special care. *See, e. g.,* Schmerber v. California, 384 U.S. 757, 766–772, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); United States v. Ventresca, 380 U.S. 102, 106, 85 S.Ct. 741, 13 L. Ed.2d 684 (1965).

██ In exercising this power of review, courts must give particularly careful weight to the fundamental Fourth Amendment principle which has been given renewed emphasis in the housing inspection [13] and stop-and-frisk [14] cases: a search will comply with the requirements of the Fourth Amendment only if its scope is no broader than necessary to accomplish legitimate governmental objectives. This principle is stated most clearly in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which the Supreme Court upheld an on-the-street detention and search for weapons of three suspects. The Court found that the police officer in *Terry* had "adequate constitutional ground," but not probable cause, to believe that the men he detained and searched were going to commit a crime. In its opinion

judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). (Footnotes omitted.) *Accord,* Coolidge v. New Hampshire, 403 U.S. 443, 454–455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Twenty years before *Katz* the Court had written:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. * * * When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). (Footnotes omitted.)

In a recent law journal article the importance of the warrant is described as follows:

" * * * Assessment of the reasonableness of a proposed search by a neutral magistrate is thought by the Court to be a necessary restraint on police. In theory, the magistrate should refuse to approve unreasonable intrusions and should limit by warrant the scope and manner of justifiable searches. In practice, review by a neutral magistrate may become routinized and thus fail to prevent unjustified searches. But at the least, the warrant procedure facilitates later judicial review of the search's constitutionality by requiring a prior sworn statement of police justifications."

Note, Scope Limitations for Searches Incident to Arrest, 78 Yale L.J. 433, 436–437 (1969). (Footnotes omitted.) *See also* Wong Sun v. United States, 371 U.S. 471, 481–482, 84 S.Ct. 1758, 12 L.Ed. 977 (1963); McDonald v. United States, 335 U.S. 451, 455–456, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

13. Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *see* Note, The Fourth Amendment and Housing Inspections, 77 Yale L.J. 521 (1968).

14. Terry v. Ohio, *supra* note 9; Sibron v. New York, *supra* note 9. *See* LaFave, *op. cit. supra* note 9.

the Court stressed that the Fourth Amendment governs *all* intrusions by agents of the public upon personal security, 392 U.S. at 18 n. 15, 88 S.Ct. 1868, and that the manner in which the search and seizure are conducted is as much the test of their reasonableness as whether they were warranted at all. *Id.* at 28, 88 S.Ct. 1868. Citing a number of earlier cases, many of which involved searches initiated upon probable cause, the Court in *Terry* stated that "[t]his Court has held in the past that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope," and that "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Id.* at 17–19, 88 S.Ct. at 1878. Thus the Court made absolutely clear that the underlying rationale of *Terry* was a restatement of, rather than a departure from, existing case law, and that, although *Terry* itself involved a search upon less than probable cause, the scope limitation principle was to apply to all searches no matter what the evidentiary basis for their initiation.

If *Terry* left any doubt at all that the scope limitation principle was intended by the Supreme Court to apply to arrest based searches, that doubt was expressly foreclosed by the last of the cases in the *Terry-Sibron-Peters* trilogy. In *Peters v. New York,* which is consolidated with *Sibron v. New York,* 392 U.S. 40, 88 S. Ct. 1889, 20 L.Ed.2d 917 (1968), Officer Lasky of the New York City Police Department was off duty at his apartment when he heard a noise at the door. Looking through the peephole into the hall, he saw two men he did not believe to be fellow tenants tip-toeing out of the alcove toward the stairway. Officer Lasky called police headquarters, put on civilian clothes, and armed himself with his service revolver. Believing he had happened upon the two men in the course of an attempted burglary, Officer Lasky opened his door, entered the hallway, and slammed the door loudly behind him. When the door slammed the two men fled down the stairs and Officer Lasky gave chase. When he caught up with Peters on the stairs and questioned him, Peters explained his presence in the building by saying he was visiting a girl friend whose name he chivalrously declined to reveal on the ground that she was a married woman. Officer Lasky then patted Peters down for weapons and discovered a hard object in his pocket. The object did not feel like a gun, but he thought it might be a knife. Officer Lasky removed this object from Peters' pocket and found it was an opaque envelope containing burglar's tools.

Given this factual situation, the Supreme Court held that Officer Lasky legally arrested Peters when he collared him on the stairway and curtailed his freedom of movement. This arrest was found to be valid because made on the basis of probable cause to believe Peters was engaged in criminal activity. At this point, according to the Supreme Court,

> "[Officer Lasky] had the authority to search Peters, and the incident search was obviously justified 'by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime.' * * * *Moreover, it was reasonably limited in scope by these purposes. Officer Lasky did not engage in an unrestrained and thoroughgoing examination of Peters and his personal effects.* * * * *"

392 U.S. at 67, 88 S.Ct. at 1905. (Emphasis added.) In *Peters,* then, the Supreme Court applied the scope limitation principle to an arrest based search and found that the search—which took the form of a frisk followed by a further intrusion into the arrestee's pockets only after an object possibly a weapon had been felt—was "reasonably limited in scope by [its] purposes" and was not so "unrestrained and thoroughgoing" as to violate the Constitution.

Similarly, in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Court used its scope limitation principle to measure the constitutionality of a far-ranging search of a house incident to a lawful arrest for larceny. *Terry* was specifically referred to, and the *Chimel* search, in which police discovered coins appellant was accused of stealing, was found to be unconstitutional because it was not " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." 395 U.S. at 762, 89 S.Ct. at 2039. *Chimel* holds that incident to a lawful arrest for a crime such as theft, which requires instrumentalities and bears fruits, there is ample justification for a warrantless search of "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763, 89 S.Ct. at 2040.

■ Thus although the consequences of application of the scope limitation principle may differ under varying circumstances, it is clear that *all* searches, whether or not based upon probable cause, are governed by the rule, and that in determining the constitutionality of any particular search "our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, *supra*, 392 U.S. at 19–20, 88 S.Ct. at 1879.

### III

■ What then are the legitimate objectives of an arrest based search of the person? What is it that renders such searches permissible at their inception, and to which the scope of such searches must be tied, if their reasonableness is to be maintained? Though they receive slightly different formulation in various cases, the legitimate objectives of warrantless searches of the person incident to arrest seem to be (1) seizure of fruits, instrumentalities and other evidence of the crime for which the arrest is made in order to prevent its destruction or concealment; and (2) removal of any weapons that the arrestee might seek to use to resist arrest or effect his escape.[15] The question

---

15. *See, e. g.*, Chimel v. California, 395 U.S. 752, 762–763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ; Katz v. United States, *supra* note 12, 389 U.S. at 357 n. 20, 88 S.Ct. 507, 19 L.Ed.2d 576. According to Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964), "The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control." A recent law journal note comments that "[d]espite the mysterious 'for example,' a thorough search of the case law reveals no other justifications for warrantless searches incident to arrest which do not collapse upon careful inspection into one of the two bases articulated in *Preston.*" Note, *supra* note 12, 78 Yale L.J. at 434 n. 12. *See also* Note, Search and Seizure —Search Incident to Arrest for Traffic Violation, 1959 Wis.L.Rev. 347, 349 & n. 14.

A recent note in the Columbia Law Review suggests that the only kind of search justified automatically by a lawful arrest is the evidentiary search :

" * * * [S]earch incident to arrest is often confused with a search for weapons made in order to protect a police officer. It is not the arrest which gives rise to the need to make a protective search but rather reasonable cause to believe that a suspect is armed. The situations in which a protective search will be permitted are broader than those which will justify a search incident to arrest whereas the scope of a protective search should be more strictly constrained than that of a search incident to arrest. These two standards should operate separately, and indeed the Supreme Court has held that a lawful arrest is not necessary to justify a protective search. What a lawful arrest does justify is the search for fruits, instrumentalities and evidence *of the crime for which the arrest*

presented, then, is whether either of these objectives justifies a full search of the person incident to a lawful arrest for violation of a mere motor vehicle regulation.

Since fruits, instrumentalities or other evidence of crime concealed on the person of the arrestee may be easily disposed of or destroyed, the arresting officer will often be justified in searching for such evidence without delay. But the scope limitation principle requires that when police search a person incident to arrest, the search must be directed toward finding evidence which the arresting officer has probable cause to believe will be found on the person, and that the search be no more intrusive than necessary to recover such evidence. For most crimes, of course, it is clearly reasonable to assume that the arrestee will be in possession of the fruits, instrumentalities or other evidence of the crime for which the person was arrested. Thus in such situations "the circumstances justifying the arrest are also those furnishing probable cause for the search." Chambers v. Maroney, 399 U.S. 42, 47 n. 6, 90 S.Ct. 1975, 1979 n. 6, 26 L.Ed.2d 419 (1970). For other

crimes, however, and more particularly for most traffic offenses,[16] no search of the person for evidence may be allowed at all because no evidence exists to be found. Admittedly, appellant's offenses in this case—driving after his operator's permit had been revoked and obtaining a new permit by misrepresentation—are relatively serious ones on the continuum of traffic infractions. Nonetheless, upon stopping Willie Robinson for the second time and upon receiving for the second time Robinson's fraudulently obtained temporary operator's permit, Officer Jenks had secured the only evidence of the crime for which the arrest was made which he could possibly have had probable cause to believe was in the arrestee's possession.[17] No further arrest based search for evidence was therefore reasonable or constitutional.

There is, of course, a second, very important, justification for searches incident to arrest—the interest of government in the safety of its police officers. In Terry v. Ohio, *supra*, the Supreme Court recognized that when a police officer stops a citizen on the street in the course of a legitimate investigation "there must be a narrowly

---

*is made,* and this is so only because the existence of probable cause for the arrest of a person normally justifies probable cause to believe that the suspect possesses such items."

Note, Searches of the Person Incident to Lawful Arrest, 69 Colum.L.Rev. 866, 870–871 (1969). (Emphasis in original.)

16. The main exceptions to this rule are arrests for driving under the influence of alcohol or narcotics. These arrests may —though not necessarily in every case— be predicated on facts which also constitute probable cause to believe that alcohol or narcotics will be discovered in a search of the person or vehicle. *See,* *e. g.,* Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); Howell v. Cupp, 9 Cir., 427 F. 2d 36 (1970); Wellman v. United States, 5 Cir., 414 F.2d 263 (1969); State v. Cusick, 110 N.J.Super. 149, 264 A.2d 735 (1970).

17. In earlier proceedings in this case the Government contended that there may have been an evidentiary basis for the

search of appellant. This was said to reside in the fact that notices of permit revocation are normally sent to offending drivers, and finding such a notice in appellant's possession would have been probative of his knowing commission of the crime for which he was arrested. Whatever the merits of this argument generally, it clearly is inapplicable to the case at hand. At the remand hearing in this case, it came to light that (1) appellant's operator's permit had been revoked in Sept. 1962; (2) his notice of revocation was received and signed for by him on March 23, 1963—more than 5 years prior to the instant arrest and search; and (3) Ofifcer Jenks was aware of these facts by virtue of his inspection of appellant's "traffic records." Thus the likelihood that appellant would be carrying on his person a 5-year-old notice of revocation was so remote as to be practically nonexistent. Under these circumstances, the Government conceded, the District Court ruled, and we agree, that there was simply no evidentiary basis for a search of appellant's person.

drawn authority to permit a reasonable search for weapons for the protection of the police officer \* \* \*." 392 U.S. at 27, 88 S.Ct. at 1883. The Court made clear, however, that the right to exercise that authority was not automatic. Rather, such intrusions are permissible *only* if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the officer's belief that the person with whom he is dealing is both armed and presently dangerous. *Id.* at 21, 88 S.Ct. at 1880. Moreover, since the sole basis for such a search is the protection of the officer, the Court held that even when the officer reasonably believes himself to be in danger, the search actually conducted "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer \* \* \*." *Id.* at 26, 88 S.Ct. at 1882. Thus the Court in *Terry* approved a patdown or "frisk" of the appellant's outer clothing for weapons, with a further intrusion only after finding a weapon, precisely because such an intrusion was adequate to protect the officer and was confined "strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons." *Id.* at 30, 88 S.Ct. at 1884.

Similarly, in Sibron v. New York, *supra,* another stop-and-frisk case, the Court held that a direct intrusion into the pockets of a narcotics suspect was unreasonable at its inception because the mere association of the suspect with other known narcotics offenders was held not to have given the officer justification for any search whatever. Before conducting a self-protective search for weapons, the Court held, the officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." 392 U.S. at 64, 88 S.Ct. at 1903. Moreover, the Court in *Sibron* went further and held that, assuming *arguendo* that the officer had reason to suspect Sibron was armed, the actual

search—a direct intrusion into the suspect's pockets rather than a frisk— would still have been constitutionally invalid because "not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer \* \* \*." *Id.* at 65, 88 S.Ct. at 1904.

Thus *Terry* and *Sibron,* when read together, stand for the proposition that in the stop-and-frisk situation where, as in the routine traffic arrest, there can be no evidentiary basis for a search, the *most* intrusive search the Constitution will allow is a limited frisk for weapons, and even then only when the officer reasonably believes himself to be in danger. The Government contends, however, that the standards enunciated in *Terry* and *Sibron* are inapplicable to the instant case because the "stops" and "frisks" involved in those decisions were predicated only upon "reasonable suspicion" whereas here, since appellant was arrested on probable cause, a full search was justified. But in focusing on the different quanta of evidence required to justify different degrees of seizures or searches of the person, the Government loses sight of the even more telling distinction between the evidentiary and protective purposes of searches. It is upon this latter distinction that our case hinges.

Because the arrest based searches reviewed and validated by the courts have usually had *both* evidentiary and protective functions, the casual reader may be given the false impression that these cases stand for the proposition that a lawful arrest will *always* support a full search of the person. Obviously, when the arrest is made for a crime for which evidence exists, a warrantless intrusion into the pockets of the arrestee to discover such evidence is reasonable under the "search incident" exception. The officer may, of course, also use this reasonable intrusion to look simultaneously for weapons. But in a fact situation such as ours, where the

search can have no evidentiary function, a more careful analysis of proper scope limitations is called for. When the sole legitimate goal of the search is the protection of the officer, the paramount factor in determining the reasonableness of the intrusion is the danger actually presented, and it is of no moment whether the protective search for weapons is incident to an "arrest" based on probable cause or incident to a "stop" based only upon reasonable suspicion. "In short, the physical risk to the officer is created by the circumstances of the confrontation taken as a whole, not by the technical niceties of the law of arrest." People v. Superior Court of Los Angeles County [Simon], 7 Cal.3d 186, 101 Cal.Rptr. 837, 850, 496 P.2d 1205, 1218 (1972) (*en banc*).

## IV

■ In determining the extent to which the legitimate governmental interest in insuring the safety of law enforcement officers justifies a search of the person incident to a lawful arrest, a distinction must be drawn between the "routine" traffic arrest—where the officer simply issues a notice of violation and allows the offender to proceed—and the more serious cases in which the officer effects an "in-custody" arrest in order to transport the traffic offender to the stationhouse for booking. Turning first to the "routine" traffic arrest,[18] it seems evident that the dangers presented in that situation are to some extent similar to, and certainly no greater than, those presented in the stop-and-frisk situations involved in *Terry* and *Sibron*.[19] Like the investigatory stop, the routine traffic arrest is merely a brief on-the-street encounter. Moreover, the vast majority of traffic violators are law-abiding citizens. Indeed, "[v]ery few drivers can traverse any appreciable distance without violating some traffic regulation." [20] and as Chief Judge Fuld of the New York Court of Appeals has noted, "A motorist who exceeds the speed limit does not thereby indicate any propensity for violence or iniquity, and the officer who stops the speeder has not even the slightest cause for thinking that he is in danger of being assaulted." People v. Marsh, 20 N.Y.2d 98, 101, 281 N.Y.S.2d 789, 792, 228 N.E.2d 783, 786 (1967).[21]

■ This is not to say, of course, that a minor traffic stop can never erupt into violence. On the contrary, whenever a police officer confronts a citizen on the street an element of danger is present. But as the stop-and-frisk cases make clear, the mere possibility of danger cannot justify any and all searches the officer may wish to con-

18. As we shall see, the instant case does not involve a "routine traffic stop, where the officer simply issues a notice of violation and allows the offender to proceed." Rather, because of the unusual nature of appellant's offenses Officer Jenks was required to take appellant into custody and transport him to the stationhouse for booking. However, the Government in this case has strongly pressed this court to declare that there exists an unqualified right to search incident to *all* traffic arrests—whether or not the violator will be taken into custody. Thus we must first address ourselves to the routine traffic arrest situation before determining the significance under the Fourth Amendment, if any, of the in-custody aspect of appellant's arrest.

19. Indeed, since investigatory stops frequently involve persons suspected of seri-

ous crimes, many of which entail use of weapons, the dangers presented in those situations may be far greater than in the routine traffic arrest involving mere issuance of a notice of violation for a minor infraction.

20. B. George, Constitutional Limitations on Evidence in Criminal Cases 65 (1969 ed.).

21. · See also Note, *supra* note 15, 69 Colum. L.Rev. at 874: "A protective search for weapons should be justified by an arrest alone only to the extent that the arrest creates a reasonable suspicion that the suspect is armed and dangerous. The mere arrest for a traffic violation would not appear to create such a reasonable belief."

duct. The touchstone of the Fourth Amendment is reasonableness, and the possibility that a routine traffic stop might result in injury to the officer, although unquestionably real, is so remote [22] that "[t]o allow the police to routinely search for weapons in all such instances would * * * constitute an 'intolerable and unreasonable' intrusion into the privacy of the vast majority of peaceable citizens who travel by automobile." People v. Superior Court of Yolo County [Kiefer], 3 Cal.3d 807, 91 Cal. Rptr. 729, 744, 478 P.2d 449, 464 (1970) (en banc).

We therefore conclude that the permissible scope of searches incident to routine traffic arrests, where there is no evidentiary basis for a search and where the officer intends simply to issue a notice of violation and to allow the offender to proceed, must be governed by the

teaching of the Supreme Court as set forth in Terry and Sibron. Thus the most intrusive search the Constitution will allow in such situations is a limited patdown for weapons, and then only when there exist special facts or circumstances which give the officer reasonable grounds to believe that the person with whom he is dealing is armed and presently dangerous.

As the Government points out, however, the instant case involves not a "routine" traffic arrest, but rather a situation in which the arresting officer was required to take appellant into custody. According to applicable Metropolitan Police Department regulations, "[t]he use of Traffic Violation Notices is a courtesy of long standing and shall be employed whenever possible, consistent with the overall safety of the public." [23] Nevertheless, for certain of

---

22. We are not unmindful of the tragic fact that in this country in the period between July 1, 1970 and June 30, 1971 6 police officers died and 92 others were injured in the course of making traffic arrests. See International Association of Chiefs of Police, Annual Law Enforcement Casualty Summary 11, Fig. 8 (July 1970—June 1971). These statistics, however, must be placed in proper perspective. Considering the millions of traffic arrests made annually, the fact remains that these arrests constitute possibly the safest of all law enforcement activities.

23. Metropolitan Police Department General Order No. 3, Series 1959 (April 24, 1959). In relevant part the order states:
"The use of Traffic Violation Notices is a courtesy of long standing and shall be employed whenever possible, consistent with the overall safety of the public.
"Only in the more serious or aggravated types of traffic violations, those which indicate a serious disregard for the safety of others, or those in which the officer has reasonable grounds to believe that the individuals concerned will, in all probability, ignore the Traffic Violation Notices, should it be necessary to make summary arrest. These include, but are not confined to: 'Fleeing from the Scene of an Accident'; 'Driving under the influence of Intoxicating Liquor or Narcotic Drugs'; 'Reckless Driving'; 'Operating Without

a Permit'; 'Operating After Suspension or Revocation of Operator's Permit'; 'Excessive Speed Cases' indicating an absolute disregard for the safety of others and any other violations where the officer, after having checked with traffic records, ascertains that the operator is frequently changing his place of residence or employment. In these types of cases and in the interest of public safety, it is not appropriate to permit the offending motorists to continue on to their destinations and summary arrests should be made.
"Summary arrests should also be made for traffic violations when it is known beforehand that there are accumulated against the operator of the vehicle outstanding tickets or warrants which have been ignored, when the operator has been avoiding services of a suspension or revocation notice or when it is known or suspected that he is wanted for a felony or other serious infraction of the law.
"Except as provided in the two preceding paragraphs, whenever the operator of a vehicle is able to produce valid or prima facie credentials as to his or her identity and either lives or works in the District of Columbia, the officer shall issue a Traffic Violation Notice."
(Emphasis added.)
It should also be noted that 23 D.C.Code § 1110(b)(1) (Supp. V 1972), which provides that "[a]n officer or member

the "more serious or aggravated types of traffic violations," issuance of a notice of violation is prohibited, and the officer is required to make an in-custody arrest. Among these is the offense of "Operating After Suspension or Revocation of Operator's Permit," one of the two offenses for which appellant was lawfully arrested. Thus the Government asserts that, even though a police officer may not conduct a full search of the person incident to a lawful traffic arrest involving mere issuance of a notice of violation, such a search should be permitted where, as here, the officer is required to take the offender into custody.

 As noted earlier in this opinion, the scope limitation principle of the Fourth Amendment is essentially "functional" in nature—that is, the consequences of its application will vary according to the particular circumstances in which it is applied. Thus in determining the permissible scope of searches incident to in-custody arrests for mere traffic violations, we cannot ignore the fact that, unlike the momentary and relatively minor dangers presented in the stop-and-frisk situation or in the routine traffic stop, the dangers to which the police are exposed in the circumstances of a custodial arrest are sharply accentuated by the prolonged proximity of the accused to police personnel following the arrest. As Chief Justice Wright of the California Supreme Court has noted, the crucial distinguishing feature of the in-custody arrest "is not the greater likelihood that a person taken into custody is armed, but rather the increased likelihood of danger to the officer *if* in fact the person is armed." People v. Superior Court of Los Angeles County [Simon], *supra*, 101 Cal.Rptr. at 857, 496 P.2d at 1225 (concurring opinion). (Emphasis in original.) With this increased danger in mind, it would seem clearly unreasonable to expect a police officer to place a suspect in his squad car for transportation to the station-house without first taking reasonable measures to insure that the suspect is unarmed. We therefore conclude that whenever a police officer, acting within the bounds of his authority,[24] makes an in-custody arrest, he may also conduct a limited *frisk* of the suspect's outer clothing in order to remove any weapons the suspect may have in his possession. There are circumstances in which the element of danger may require a full search even as to persons arrested for relatively minor traffic-type offenses, as where the frisk causes the officer's suspicion to be reasonably aroused as to weapons (*see* note 9 *supra*). But no such predicate was advanced for the search at bar. The record clearly establishes Jenks searched appellant without any purpose in mind—"I just searched him"—because this was standard police instruction.

 The Government contends still further, however, that a frisk does not provide reasonable protection to the officer in the circumstances of an in-custody arrest. We cannot agree. Under the scope limitation principle of the Fourth

of the Metropolitan Police Department who arrests without a warrant a person for committing a misdemeanor may, instead of taking him into custody, issue a citation requiring the person to appear before an official of the Metropolitan Police Department designated * * * to act as a clerk of the Superior Court," apparently "does not change the procedures in the issuance of traffic violation notices." Metropolitan Police Department General Order No. 30, Series 1970, at 3 (Sept. 21, 1970).

24. The decision to make a summary arrest, we must emphasize, does *not* lie in the absolute discretion of the officer. Rather, as the Metropolitan Police Department regulation quoted *supra* note 23 makes clear, a traffic violator may not be subjected to custodial arrest except in extreme circumstances involving disregard for the safety of others or articulation of the offenders' intention to ignore notices. Thus a protective frisk for weapons, predicated upon the custodial nature of the arrest, will be constitutional *only* if the arresting officer acted within his authority under the applicable regulations in deciding to effect the arrest.

Amendment, "[a] search for weapons * * * must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." Terry v. Ohio, *supra*, 392 U.S. at 25–26, 88 S.Ct. at 1882. And in evaluating the reasonableness of a search, it is necessary "first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen," for there is "no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 534–535, 536–537, 87 S.Ct. 1727, 1734, 1735, 18 L.Ed.2d 930 (1967).

Turning first to the interests of the individual, we must recognize that the properly conducted frisk which we would permit with any in-custody arrest is far more than a "petty indignity." On the contrary, "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." Terry v. Ohio, *supra*, 392 U.S. at 24–25, 88 S.Ct. at 1882. Thus if we are to strike a reasonable balance under the Fourth Amendment, any *further* intrusion upon the individual's privacy should be permitted only if necessary to achieve substantial governmental interests. And this is all the more true where, as here, the officer may not even have reasonable grounds to believe that the individual, who has been arrested for a mere traffic violation, is either armed or dangerous.[25]

Moreover, when viewed from the reverse side of the equation, we are firmly convinced that a carefully conducted frisk offers substantial protection to the officer. In Terry v. Ohio, *supra*, the Supreme Court adopted the following definition of a frisk:

" '[T]he officer must feel with sensitive fingers every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and the entire surface of the legs down to the feet.' "

392 U.S. at 17 n. 13, 88 S.Ct. at 1877 n. 13, *quoting* Priar & Martin, Searching and Disarming Criminals, 45 J.Crim.L.C. & P.S. 481 (1954). Such a frisk, the Court concluded, is "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of

---

25. Although the rather momentary dangers in the stop-and-frisk situation may be viewed as less substantial than those presented in the more prolonged custodial arrest, it must be remembered that in *Terry* and *Sibron* the Supreme Court held that the most intrusive search the Constitution will allow during an investigatory stop is a mere patdown for weapons—and this is so *even though* the officer has reasonable grounds to believe the suspect is armed and dangerous. In reaching this conclusion, moreover, the Court's reasoning gave full attention to the important value of protecting the officer:

"* * * Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

"* * * When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."

392 U.S. at 23–24, 88 S.Ct. at 1881. Cognizant of all these considerations, the Court in *Terry* and *Sibron* made clear that a properly conducted frisk would provide adequate protection to the officer.

the police officer." 392 U.S. at 29, 88 S.Ct. at 1884.

The evidence presented at the remand hearing in this case clearly supports this conclusion. Police Sergeant Dennis Donaldson, an instructor at the District of Columbia Police Training Division, testified that in order to protect the arresting officer the standard police practice in the District of Columbia is to conduct a full search of the person whenever an in-custody arrest is made. On cross-examination, however, Sergeant Donaldson admitted that, although the effectiveness of a patdown may vary according to the circumstances, a properly conducted *Terry* type frisk could uncover virtually every weapon he had ever encountered [26] in the course of in-custody searches. Mr. Ronald Newhouser, a recognized expert in clandestine weaponry,[27] also testified for the Government. During the course of his testimony Mr. Newhouser removed from his person 25 concealed weapons that could kill or incapacitate.[28] Like Sergeant Donaldson, however, Mr. Newhouser conceded that virtually all of these weapons could be detected in the course of a properly conducted frisk.[29]

We do not mean to suggest, of course, that a protective frisk removes all conceivable dangers to the officer. There will always be the long shot [30] case in the which the arrestee has concealed a novel weapon—perhaps a razor blade shaped like a coin—which a frisk will fail to reveal. But the kind of thoroughgoing search which would offer *total* protection to the officer could only be accomplished at a complete sacrifice of the arrestee's right to privacy. Indeed, as Mr. Newhouser admitted, the only means of eliminating all possible

---

26. Sergeant Donaldson testified that the following weapons had been encountered during in-custody searches: ice picks, revolvers of all kinds, sawed-off shotguns, knives, letter openers, and razor-blade box openers.

27. Among other things, Mr. Newhouser is supervisor of the National Bomb Data Center, and he has taught courses in clandestine weaponry to both international and domestic governmental agencies.

28. Mr. Newhouser listed these weapons as follows: "A Scalpel Blade, a Scalp Hook or Stab Hook, a Hypodermic Needle with Poison Bag attached, a .22 Derringer Pistol, a Stab Needle, Chemical Mace, a Short Stab Needle, another Stab Needle, a .22 pistol, a Pengun which fires live ammunition, a Blow-gun with a poison dart, a Knife, a Hacksaw Blade Knife, another Stab Hook, a Razor Blade, another Knife, another Razor Blade, a Stab Hook Razor Blade, a 12-inch Stab Needle, a Poison Spray, another Knife, a .22 calibre Automatic Pistol and a Hand Grenade."

29. There was, however, some definitional confusion in Mr. Newhouser's testimony. Initially he defined a frisk as "[a] patdown, essentially, a hasty search" which is used when "you are looking for a large concealed weapon, such as a pistol, a hunting knife or something like this." Given this definition, Mr. Newhouser testified that a frisk would have discovered only the pocket knife. Under cross-examination, however, and confronted with the *Terry* definition of a frisk, Mr. Newhouser testified that all of the 25 weapons could be detected. Finally, on redirect examination, Mr. Newhouser explained that his answer on cross-examination had included the concept that "[a]s you found the suspicious items you would have to follow that lead." That concept is, of course, well within the proper scope of a *Terry* type frisk. *See* note 9 *supra*.

30. Approximately 92% of all police fatalities in the period between July 1, 1970 and June 30, 1971 were caused by firearms. International Association of Chiefs of Police, *op. cit. supra* note 22, at 2. Virtually all firearms, of course, could be detected in the course of a carefully conducted frisk. The only types of weapons which might conceivably escape detection in such a frisk fall within the category of knives and other sharp instruments. These weapons, however, were responsible for less than 4% of all police fatalities and approximately 5% of all police casualties during this period. *Id.* at 5, Fig. 11. And as the testimony at the remand hearing makes clear, many, if not all, of these weapons could be uncovered in a *Terry* type frisk. *Compare* United States v. Del Toro, 2 Cir., 464 F.2d 520 (1972).

risk to the officer is to allow him to spread-eagle the arrestee, strip him of his clothing, and feel into his body cavities for weapons. Deciding what is a reasonable intrusion, given the legitimate objective of protecting the arresting officer, calls for a careful balancing of competing interests. Our position reflects this balancing.[31]

## V

Pressing its argument still further, however, the Government suggests an alternative theory in support of its contention that a full search of the person should be allowed whenever an in-custody arrest is made. When a suspect has been lawfully arrested and "booked" on a criminal charge and is to be placed in stationhouse detention, it is ordinarily reasonable to conduct a search of his person [32] in order to prevent introduction of weapons or contraband into the jail facility.[33] From this premise the Government argues that, since the suspect will eventually be searched at the stationhouse anyway, a search of this kind might "just as well" be conducted in the field at the time of arrest. Whatever the merits of this argument generally, this court's recent *en banc* decision in United States v. Mills, *supra*,

---

31. The Government presents 2 additional arguments which merit only brief discussion. First, it is suggested that a full search of the person is necessary not only to protect the officer, but also to remove any weapons the arrestee might use to inflict injury upon himself. It seems obvious, however, that in most instances at least a frisk which is sufficient to protect the officer will also suffice to protect against self-inflicted injury by the arrestee. Moreover, in the absence of some statistics to the contrary, we simply cannot believe a significant number of persons will attempt to end their lives simply because they have been arrested for a mere traffic violation.

Second, the Government suggests that our decision today will not deter the police from conducting unlawful searches, since their goal in such searches is to protect themselves rather than to obtain evidence. The same argument was, of course, considered in *Terry*, and the Court apparently concluded that since a frisk was sufficient to satisfy the officer's interest in self-protection, the rule prohibiting full searches would have substantial deterrent effect. Moreover, we find it somewhat ironic, to say the least, that the Government should contend that our police officers, whose duty it is to uphold the law, would disregard the very law they are entrusted to enforce. We agree with the District Court which, when faced with this same argument at the hearing on remand in this case, concluded that the Government "is simply saying that regardless of what the Courts, the legislatures or anybody else says the police will take the law into their own hands. I will not consider that." Despite the Government's pessimism, we are firmly convinced that most police officers are law-abiding citizens, and that the rule we adopt today will provide an effective deterrent to unlawful police searches.

32. As we noted in United States v. Mills, 153 U.S.App.D.C. —, — n. 11, 472 F.2d 1231, 1239 n. 11 (decided May 10, 1972) (*en banc*), when a person is arrested for a petty offense, assuming he can be detained at all, a question arises as to whether he "can be subject to a thorough search, or whether a less extreme intrusion on privacy does not mark the limits of reasonableness, as by giving him an opportunity, like that accorded someone given a bathhouse locker for temporary use, to 'check' his belongings in a sealed envelope, perhaps upon executing a waiver releasing the officer of any responsibility." We do not decide that question today.

33. The justification for stationhouse searches, of course, is not the mere process of "booking," but rather the fact that the suspect will be placed in jail. See, e. g., United States v. Mills, *supra* note 32, 153 U.S.App.D.C. at —, 472 F.2d at 1234; People v. Overlee, Colo., 483 P.2d 222, 223 (1971) (*en banc*); Carpio v. Superior Court, County of Santa Barbara, 19 Cal.App.3d 790, 793, 97 Cal.Rptr. 186, 188 (1971). Thus, according to Metropolitan Police Department regulations: "*Before being placed in confinement,* prisoners shall be thoroughly searched and money, jewelry, other articles of apparent material value, billfolds and contents, ties, belts, suspenders, and all weapons and other articles with which they might injure themselves or effect an escape, shall be taken from them." Manual of the Police Department, ch. VI, § 3. (Emphasis added.)

makes clear that it is inapplicable to the case at hand.

In *Mills* the defendant was arrested for the petty offense of driving with a learner's permit while unaccompanied by a licensed driver. Rather than simply issue a notice of violation, the arresting officer elected to make an in-custody arrest. The officer then frisked the defendant and, finding no weapons, called a scout car to transport the defendant to the stationhouse. After arriving at the stationhouse, the defendant was brought to the booking desk. At that point the defendant clearly had the right to post $50 collateral for his offense and, upon doing so, to be released immediately, without any detention or search of his person. Instead of informing him of his right, however, the officers ordered the defendant to remove everything from his pockets. Among his possessions the police discovered 22 capsules of heroin and 33 capsules of cocaine. Under these circumstances, the court held the stationhouse search unconstitutional and therefore reversed the defendant's conviction of violations of the federal narcotics laws.

Initially the court noted that there could be no evidentiary basis for this search since the defendant's offense was proved completely at the time of arrest. Moreover, the search could not be justified on the basis of protective considerations because the arresting officer had already frisked the defendant for weapons. Thus "[t]he validity of the search," the court concluded, "must stand or fall on the premise that it was a predetention inventory, undertaken to hold and account for valuable or potentially dangerous personal property—such as rings, belts, watches or jewelry—during the detention of the person arrested." 153 U.S.App.D.C. at ——, 472 F.2d at 1234.

Emphasizing the defendant's right to post collateral, the court then stated that, although a search of the person incident to stationhouse detention may be reasonable, "it would be entirely unreasonable to hold that policemen have discretion to detain and therefore thoroughly search petty offenders * * * who may avoid stationhouse detention altogether by posting collateral." 153 U.S.App.D.C. at ——, 472 F.2d at 1240. The court therefore held:

> "When a person is charged with a collateral-type petty offense, under which he rightfully has the opportunity to post collateral and avoid further detention, and there is no probable cause to believe he committed a more serious crime, the police may not engage in an inventory search of the offender, or an equivalent direction that he empty his pockets, and seek to support it on the ground of holding him in further confinement, unless at a minimum he was timely notified of his opportunity to post collateral (and thus avoid further detention) and refused or was unable to do so. * * * " [34]

 As in *Mills*, we "do not here consider the proper scope of a search that is supported by the premise of forthcoming confinement." 153 U.S. App.D.C. at ——, 472 F.2d at 1234. Although appellant Robinson had no right to post collateral for his offenses, he was clearly entitled to post either cash or bail bond[35] and, upon doing so, to be

---

34. 153 U.S.App.D.C. at ——, 472 F.2d at 1240. The court also noted that "[w]hen a petty offense is of a collateral nature, a question arises whether an offender without means * * * can be detained on account of such violation—or whether such detention enforces an invidious discrimination on the basis of wealth." 153 U.S.App.D.C. at —— n. 11, 472 F.2d at 1239 n. 11. We do not decide that question today.

35. The rules of the Superior Court preclude posting collateral for appellant's offenses, but a person arrested for obtaining a permit by misrepresentation may post a cash bond of $100 or bail bond of $200, and a person arrested for driving after revocation may post either cash or bail bond of $300. The only significant difference between collateral and bond is that the person released on collateral need not appear in court—that is, if he

released immediately, without any stationhouse confinement or incident search of his person.[36] Moreover, even if appellant was unable to post such bond, he might still have been eligible for pre-detention release under the recently enacted citation release program.[37] Officer Jenks had no way of knowing, one way or the other, whether appellant was eventually to be incarcerated at the stationhouse. He therefore had no tenable basis for making a search on the assumption that there would be incarceration. The official who is called upon to make the determinations involved in the decision on incarceration—the arrangements for bail, the possibility of a citation issued at the stationhouse—must make that decision before it may be used to justify an intrusion on privacy as one permissible under the Fourth Amendment. The mere possibility that such a search might later be justified obviously cannot serve to eliminate appellant's rights under the Fourth Amendment at the time of arrest. See, e. g., United States v. Mills, supra; People v. Superior Court of Los Angeles County [Simon], supra; People v. Overlee, Colo., 483 P.2d 222 (1971) (en banc).

## VI

 The result we reach today, it should be noted, is by no means unique. On the contrary, the vast majority of courts—both state and federal—which have considered the problem hold specifically that, absent "special circumstances,"[38] a police officer has no

fails to appear on the return date he is deemed to have pleaded guilty and his collateral is forfeited as execution of sentence.

36. Ordinarily a person arrested for an offense for which he may post bond or collateral is brought immediately to the Superior Court for that purpose. If the Superior Court is not in session, the stationhouse clerks who have the function of "booking" offenders serve also as acting clerks of the Superior Court and are therefore authorized to accept collateral or bond. See 23 D.C.Code § 610 (1967); 23 D.C.Code § 1110(a) (Supp. V 1972). These stationhouse clerks have no discretion to either increase or decrease the amount of bond or collateral required by court rules. See United States v. Mills, supra note 32, 153 U.S.App.D.C. at ——, 471 F.2d at 1101.

37. See 23 D.C.Code §§ 1110(b)(2), 1110(b)(3) (Supp. V 1972). Under this program, any person arrested for a misdemeanor, including a traffic violation, may be released on citation, after booking but prior to confinement, unless the stationhouse clerk has reason to believe that the offender (1) will cause injury to persons or damage to property; (2) will not make an appearance in answer to the citation; (3) is wanted for some other offense; or (4) can be sent directly to the Superior Court. See Metropolitan Police Department General Order No. 30, Series 1970 (Sept. 21, 1970). See also Metropolitan Police Department General Order No. 6, Series 502 (Dec. 1, 1971);

Metropolitan Police Department Special Order No. 10, Series 72 (Feb. 16, 1972); Metropolitan Police Department Special Order No. 45, Series 72 (July 31, 1972).

38. The most common "special circumstance" is new information which becomes readily apparent after the vehicle is stopped, as when the officer sees evidence of another crime in plain view, e. g., United States v. Drew, 5 Cir., 451 F.2d 230 (1971); Nunez v. United States, 5 Cir., 370 F.2d 538 (1967); or when the officer notes a suspicious movement by one of the car's occupants which might provide probable cause to arrest for some other crime, e. g., United States v. Thomas, S.D.N.Y., 289 F.Supp. 364 (1968); McGee v. United States, D.C. App., 270 A.2d 348 (1970); State v. Boykins, 50 N.J. 73, 232 A.2d 141 (1967); or when the arresting officer has extra knowledge which connects the driver or passengers with other crimes, e. g., Davidson v. Boles, N.D.W.Va., 266 F. Supp. 645 (1967); People v. Watkins, 19 Ill.2d 11, 166 N.E.2d 433 (1960); or at least increases the likelihood that such a connection exists, e. g., Kershner v. Boles, N.D.W.Va., 212 F.Supp. 9 (1963).

This branch of the "special circumstances" doctrine is illustrated by this court's decision in Brown v. United States, 125 U.S.App.D.C. 43, 365 F.2d 976 (1966), in which Judge (now Chief Justice) Burger, writing for a unanimous court, upheld a warrantless search of an automobile subsequent to an arrest of the driver for driving without a tag light and with an expired inspection sticker.

right to search either the person or the vehicle incident to a lawful arrest for violation of a mere motor vehicle regulation.[39] In Grundstrom v. Beto,

The court, however, was careful not to justify the search as an incident to the traffic arrest. Thus the court found that while one police officer was questioning the driver as to his traffic violations a second officer heard over the squad car radio that a robbery had been committed by a person answering the driver's general description and driving an automobile similar to the one they had just stopped. After reviewing this evidence, which became available to the officer during the arrest but before the search, the court stated:

"The questions presented on these facts are whether the police had probable cause for arresting Appellant on the robbery charge, whether they did in fact arrest him, and whether the search was therefore permissible as one incident to arrest."

125 U.S.App.D.C. at 45, 365 F.2d at 978. The court held that the officers had probable cause to arrest the driver for robbery, and that following such arrest it was reasonable to search the automobile for evidence incident to this robbery arrest.

A second type of "special circumstance" upon which courts commonly uphold searches incident to traffic arrests involves those traffic offenses for which evidence may be said to exist. This situation occurs most frequently when the person is arrested for driving while under the influence of alcohol or narcotics. *See* note 16 *supra.* Similarly, some courts have held that when a car has no license plates, or fictitious plates, and the driver cannot produce proof of ownership, probable cause exists to believe that the car may have been stolen, and the officer may therefore search both car and driver for evidence of ownership and identity. *See, e. g.,* United States v. Jackson, 7 Cir., 429 F.2d 1368 (1970); Welch v. United States, 10 Cir., 361 F.2d 214 (1966); State v. Rys, 186 Neb. 341, 183 N.W.2d 253 (1971); *see also* People v. Superior Court of Los Angeles County [Simon], 101 Cal.Rptr. 837, 842–846, 496 P.2d 1205, 1210–1214 (1972) (*en banc*). Finally, when the officer reasonably believes the driver or passengers to be armed and dangerous, he may of course frisk, although not search, for weapons, *e. g.,* State v. Curtis, 290 Minn. 429, 190 N.W.2d 631 (1971).

39. *See, e. g.,* Stidham v. Wingo, 6 Cir., 452 F.2d 837 (1971); United States v. Davis, 9 Cir., 441 F.2d 28 (1971); Bar-

rentine v. United States, 9 Cir., 434 F.2d 636 (1970); United States v. Humphrey, 10 Cir., 409 F.2d 1055 (1969); Grundstrom v. Beto, N.D.Tex., 273 F.Supp. 912 (1967); United States ex rel. Krogness v. Gladden, D.Ore., 242 F.Supp. 499 (1965); United States v. One 1963 Cadillac Hardtop, E.D.Wis., 224 F.Supp. 210 (1963); People v. Superior Court of Los Angeles County [Simon], *supra* note 38; Commonwealth v. Hagan, Ky., 464 S.W.2d 261 (1971); People v. Iverson, 34 Mich.App. 519, 191 N.W.2d 745 (1971); State v. Schevchuk, 291 Minn. 365, 191 N.W.2d 557 (1971); State v. Curtis, *supra* note 38; Roop v. State, 13 Md.App. 251, 283 A.2d 198 (1971); Commonwealth v. Lewis, 442 Pa. 98, 275 A.2d 51 (1971); Cowdin v. People, Colo., 491 P.2d 569 (1971) (*en banc*); Watt v. State, Okl.Cr., 487 P.2d 961 (1971); Thompson v. State, Okl.Cr., 488 P.2d 944 (1971); Lawson v. State, Okl.Cr., 484 P.2d 1337 (1971); State v. Anonymous, 29 Conn.Super. 153, 276 A.2d 448 (1971); People v. Marshall, 25 Mich. App. 376, 181 N.W.2d 578 (1970); People v. Ricketson, 129 Ill.App.2d 365, 264 N.E.2d 220 (1970); People v. Simmons, 130 Ill.App.2d 614, 264 N.E.2d 579 (1970); McGee v. United States, *supra* note 38; State v. Braxton, 111 N.J.Super. 191, 268 A.2d 40 (1970); Commonwealth v. Dussell, 439 Pa. 392, 266 A.2d 659 (1970); People v. Superior Court of Yolo County [Kiefer], *supra* note 22; People v. Anonymous, 56 Misc.2d 1022, 290 N.Y.S.2d 337 (1968); People v. Marsh, 20 N.Y.2d 98, 281 N.Y.S.2d 789, 228 N.E.2d 783 (1967); State v. Boykins, *supra* note 38; Sedacca v. State, 2 Md.App. 617, 236 A.2d 309 (1967); Lane v. Commonwealth, Ky., 386 S.W.2d 743 (1965); People v. Rodriguez, 47 Misc. 2d 551, 262 N.Y.S.2d 859 (1965); McCurdy v. State, 42 Ala.App. 646, 176 So.2d 53 (1965); Barnes v. State, 25 Wis.2d 116, 130 N.W.2d 264 (1964); State v. Scanlon, 84 N.J.Super. 427, 202 A.2d 448 (1964); Sellars v. State, 237 Md. 58, 205 A.2d 296 (1964); State v. Michaels, 60 Wash.2d 638, 374 P.2d 989 (1962) (*en banc*); People v. Watkins, *supra* note 38; People v. Mayo, 19 Ill. 2d 136, 166 N.E.2d 440 (1960); People v. Zeigler, 358 Mich. 355, 100 N.W.2d 456 (1960); Travers v. United States, D.C.Mun.App., 144 A.2d 889 (1958); Brinegar v. State, 97 Okl.Cr. 407, 262 P.2d 464 (1953); Elliott v. State, 173 Tenn. 203, 116 S.W.2d 1009 (1938);

N.D.Tex., 273 F.Supp. 912, 916 (1967), for example, the court, noting that the only legitimate objective of most searches incident to arrests for traffic offenses will be protection of the arresting officer, concluded that "[t]o permit all searches incidental to an arrest to be justified on the theory that the officer is searching for weapons would be to allow wholesale fishing expeditions whenever a legal arrest is made."[40]

Perhaps the most forceful statement of the principle applicable here, however, comes from a decision of the United States Court of Appeals for the Tenth Circuit. In United States v. Humphrey, 10 Cir., 409 F.2d 1055, 1057–1058 (1969), then Chief Judge Murrah[41] wrote for a unanimous panel:

"By its own terms the Fourth Amendment protects people 'against unreasonable searches and seizures.' Thus not all searches run afoul of the constitutional sanction but only those unreasonable in origin or scope. While the evolution of this constitutional standard of reasonableness has varied with our sense of justice, it is certain today that warrantless searches on probable cause are reasonable only when it is unfeasible to obtain a search warrant on proper affidavit * * *. Unless, of course, it is reasonably 'incident' to a legal arrest * * *, or can be said to be a mere 'stop and frisk' as in Terry v. Ohio, supra and Sibron v. New York) * * *. Notably, these exceptions

* * * * *

"There is a similarity between the effect of a 'pretextual arrest' and the effect of an unlawful arrest, but the two cannot be equated. Proof that a traffic arrest was only a pretext to search for evidence of another offense is significant legally only because it bears on the reasonableness of the search. Search incident to arrest is unreasonable, if there is a lack of relation between the search (or scope of the search) and the offense for which the arrest was made. That lack of relationship exists without regard to the motivative cause of the arrest when, as in this case, an automobile driver is arrested for making the wrong turn but is searched for narcotics.

"In this case one of the agents admitted that he arrested Gonzalez in order to search the automobile for narcotics. More often, the determination of the motivation for an arrest requires some judicial divination of the subjective mind. We will have fewer unconstitutional searches, if the emphasis is on the objective relationship between the nature of the offense and the nature (circumstances) of the search, rather than on the motivative cause of the arrest."

391 F.2d at 315. Judge Wisdom wrote the *Amador-Gonzalez* opinion in Jan. 1968. The "stop-and-frisk" cases decided 5 months later add still further authority to his already convincing position.

---

Annot., Lawfulness of Search of Motor Vehicle Following Arrest for Traffic Violation, 10 A.L.R.3d 314 (1966). For recent cases to the contrary, *see, e. g.*, State v. Gustafson, Fla., 258 So.2d 1 (1972); State v. Giragosian, R.I., 270 A.2d 921 (1970); State v. Coles, 20 Ohio Misc. 12, 249 N.E.2d 553 (1969); Watts v. State, Miss., 196 So.2d 79 (1967); Lane v. State, Tex.Cr., 424 S.W. 2d 925 (1967). Finally, in Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 220, 88 S.Ct. 1472, 1475, 20 L.Ed.2d 538 (1968), in which the search of an automobile was held illegal on other grounds, the Supreme Court carefully left open the question "[w]hether or not a car may constitutionally be searched 'incident' to arrest for a traffic offense".

40. *See also* the interesting discussion of this problem in Amador-Gonzalez v. United States, *supra* note 3, 391 F.2d 308. The court in that case held that the search of appellant's automobile incident to arrest for a traffic violation was unreasonable because the traffic arrest was merely the pretext for a narcotics search. Judge Wisdom went on from this point, however, to argue for a test which will switch the emphasis in assessments of the reasonableness of searches from the subjective intent of the arresting officer to a logical and manageable objective rule:

"* * * I would hold that, pretext or no pretext, a lawful arrest of an automobile driver for a traffic offense provides no lawful predicate for the search of the driver or his car— absent special circumstances.

41. Now Director of the Federal Judicial Center.

are not based on anything inherent in the exception itself but result from the inductive case by case application of the constitutional standard of reasonableness. Thus these exceptions are traditionally justified by the need to protect the arresting officers, prevent escape, collect instrumentalities or fruits of the crime (and now evidence, Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)), and prevent delay which might otherwise permit the criminal to escape or commit his crime. * * * From this rationale it is clear that the scope of a search contemporaneous with a legal arrest must have a reasonable relationship to the protection of the officer or the crime for which the accused was arrested. As stated in Terry v. Ohio, supra 392 U.S. at p. 19, 88. S.Ct. p. 1878, '[T]he scope of the search must be "strictly tied to and justified by" the circumstances which rendered its initiation permissible', i. e. the detention or arrest. * * * If not, the search is unreasonable and violates Fourth Amendment protected interests. * * * We are in complete agreement with the prevailing federal and state authority which condemns the search of persons and automobiles following routine traffic violations. * * *"[42]

Nevertheless, the Government contends that most of the courts which have considered the problem of searches incident to mere traffic arrests have failed to distinguish between "routine" arrests on the one hand and "in-custody" arrests on the other. It is clear, however, that our conclusion that a *full* search of the person should not be permitted in the in-custody situation is in accord with the opinions of those courts which *have* recognized this distinction. In Barnes v. State, 25 Wis.2d 116, 130 N.W.2d 264 (1964), for example, the defendant was stopped by two police officers for a brake light violation. Rather than simply issue a notice of violation, the officers decided to effect an in-custody arrest. The officers then conducted a full search of the defendant's person, and in his coat pocket they discovered a small quantity of marijuana. Under these circumstances, the Supreme Court of Wisconsin held that, although a limited pat-down for weapons is reasonable whenever an in-custody arrest is made, a full search of the defendant's person is neither necessary nor constitutional.

In People v. Marsh, *supra,* the defendant was arrested pursuant to an arrest warrant for a prior speeding violation. The arresting officer immediately searched the defendant and found on his person a sheet of paper implicating him in "the playing of policy." Noting that the sole legitimate basis for the search was protection of the arresting officer, the New York Court of Appeals ruled that the "custodial" nature of the arrest could not serve to justify a search of the defendant's person.

Finally, in People v. Superior Court of Los Angeles County [Simon], *supra,* a police officer on routine patrol duty at night noticed a car "driving without

---

**42.** In *Humphrey* the court found that a warrantless search of the driver of an automobile incident to an arrest for violation of a city traffic ordinance was unreasonable despite testimony that members of the Oklahoma City Police Department routinely searched traffic violators because they felt they were in danger whenever they stopped an automobile. The court also found, however, that the passenger defendants in the case had no standing to complain of the search of the driver or of the product of that search—money orders not in the driver's name. These money orders, coupled with the fact that one of the passengers made a suspicious motion with his hands as though putting something under the seat, gave the arresting officers probable cause to search the automobile and made the guns discovered during the search admissible as evidence at trial. *Humphrey* is cited approvingly in United States v. Reid, 10 Cir., 415 F.2d 294 (1969), a more recent decision of the 10th Circuit, which upholds the constitutionality of a search of an automobile following a traffic arrest because of the "special circumstances" there present.

headlights or taillights." He stopped the vehicle and asked the driver for identification. When the driver failed to produce a driver's license or a registration certificate for the car, the officer decided to make an in-custody arrest. He then searched the driver's person and found in his pants pocket a soft plastic bag containing marijuana. In a unanimous decision the Supreme Court of California held that, since there was no evidentiary basis for the search, "the search of [the driver] * * * cannot be justified as an incident to [the officer's] decision to take him into custody * * *." 101 Cal.Rptr. at 854, 496 P. 2d at 1222. *See also* State v. Curtis, 290 Minn. 429, 190 N.W.2d 631 (1971).[43]

Moreover, our conclusion as to the meaning of the constitutional safeguard, and its application to arrests for violations of the traffic code, is supported not only by analysis of the Supreme Court opinions and the decisions of a vast majority of other courts, but also by the similar analyses and conclusions which have been reached by scholars who have given careful study to the issues.[44] For example, Wayne LaFave, author of the American Bar Foundation volume Arrest (1965), whose long-term study of arrest problems led to his selection by the American Bar Association as reporter to the Committee on the Criminal Trial, noted over 10 years ago that "[a] search of the vehicle and driver incident to an arrest for a traffic violation is a police practice apparently not uncommon throughout the country," and urged that the courts undertake an exacting and detailed consideration of the problem of "defining the proper scope" of such searches. Note, Search and Seizure—Search Incident to Arrest for Traffic Violation, 1959 Wis.L.Rev. 347, 358. More recently, a writer in the Columbia Law Review found:

> " * * * [T]he historical development of incidental personal searches furnishes no support for the validation of searches based solely on the fact of lawful arrest. This point had been overlooked by the early courts, most likely because the fact situations of these early cases were such that under either a categorical or examination-of-the-facts approach, an incidental personal search could be justified. Later courts' failure to analyze the historical underpinnings of the rule and its careless expression in the early cases on the doctrine have led to a hardening of the categorical approach which only recently has begun to be questioned.
>
> "The need for this reexamination is clear. * * *"

Note, Searches of the Person Incident to Lawful Arrest, 69 Colum.L.Rev. 866, 869–870 (1969). (Footnotes omitted.)

In quite succinct fashion, Judge Nathan R. Sobel of the New York Supreme

---

43. Our decision today, we might add, offers considerably greater protection to the officer than do the decisions in *Marsh*, *Simon* and *Curtis*. In each of those cases the court concluded that even in the custodial situation the arresting officer cannot frisk unless he has reasonable grounds to believe the arrestee is armed and dangerous. *See also* American Law Institute, *op. cit. supra* note 9, §§ SS 230.2, 110.2(4), SS 230.6(1).

44. *See, e. g.*, B. George, *op. cit. supra* note 20, at 70–74; N. Sobel, Search and Seizure 119 (1964); 1 J. Varon, Searches, Seizures, and Immunities 107–108, 203 (1961); Baker & Khourie, Improbable Cause—The Poisonous Fruits of a Search After Arrest for a Traffic Violation, 25 Okla.L.Rev. 54 (1972); Simeone, Search and Seizure Incident to Traffic Violations, 6 St. Louis U.L.J. 506 (1961); Way, Increasing Scope of Search Incidental to Arrest, 1959 Wash.U.L.Q. 261; Note, Criminal Law: Furtive Movement and Vehicle Searches, 11 Santa Clara Lawyer 449 (1971); Note, Scope Limitations for Searches Incident to Arrest, 78 Yale L.J. 433 (1969); Note, Searches of the Person Incident to Lawful Arrest, 69 Colum.L.Rev. 867 (1969); Note, The Supreme Court 1966 Term, 81 Harv. L.Rev. 69, 117–122 (1967); Comment, Searches and Seizures Incident to Arrest for Minor Traffic Violations in Illinois, 1960 U.Ill.L.F. 440 (1960); Note, Search and Seizure—Search Incident to Arrest for Traffic Violation, 1959 Wis. L.Rev. 347.

Court explains that "whenever a search is made following an arrest for a traffic violation the primary purpose is no longer to arrest but rather to search for 'evidence' of entirely unrelated crimes. Such a search is ipso facto general and unreasonable." N. Sobel, Search and Seizure 119 (1964). Finally, in the recently proposed Model Code of Pre-Arraignment Procedure, which thoroughly reexamines the law of search and seizure, the American Law Institute concludes that a police officer may not conduct a full search of an individual arrested for "a traffic offense or other misdemeanor, the elements and circumstances of which involve no unlawful possession or violent, or intentionally or recklessly dangerous, conduct * * *." [45] And this is so whether or not the offender is taken into custody.[46]

The practical effect of the rule urged upon this court by the Government— permitting warrantless "full" searches incident to mere traffic arrests (or for that matter, incident to arrests for status offenses)[47]—is fearsome to imagine. As Judge Wisdom has written, the danger is "that the lowly offense of a traffic violation—of which all of us have been guilty at one time or another—may be established as the basis for searches circumventing the rights guaranteed by the Fourth Amendment." Amador-Gon-

zalez v. United States, 5 Cir., 391 F.2d 308, 318 (1968). The rule that a full search without warrant will be supported by *any* lawful arrest would give dangerously broad discretion to the police officers who would apply it. Logically and consistently applied, such a rule would endanger the rights of the physician hurrying to a night call who runs a stop sign, or of the long-haired youth with his bags packed and on his way to college who exceeds the speed limit, or of the corporate executive arrested for criminal conspiracy under the antitrust laws, or of the civil servant accused of tax fraud, or of any one of us a police officer—for whatever secret motive or for no reason at all—wishes to search without the hindrance of normal Fourth Amendment protections.

## VII

In this case, of course, we deal with criminal conduct, and there is a natural aversion to reversing a conviction on procedural grounds, given a jury verdict supported by a strong showing of guilt. It has long been recognized, however, that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear

45. American Law Institute, *op. cit. supra* note 9, § SS 230.2 (1972). *See* Commonwealth v. Freeman, Pa.Super., 293 A.2d 84 (1972).

46. For these types of offenses—whether or not the offender is taken into custody— the most intrusive search the ALI will allow at the time of arrest is a limited frisk for weapons when the officer reasonably believes the offender is armed and dangerous. *See* §§ SS 230.2, 110.2(4). The only time a "full" search is permitted is when the offender "is confined in jail because of his physical condition or on other reasonable grounds * * *." *Id.* at § SS 230.6(1).

47. We are not called upon to decide today the proper limits for searches incident to arrest for "status" offenses, or to reexamine this court's decision in Worthy v. United States, 133 U.S.App.D.C. 188, 409

F.2d 1105 (1968). We do, however, agree with the conclusions reached in the Columbia Law Review and Yale Law Journal notes cited in note 44 *supra* that the wiser approach would be to have the rule we articulate in this opinion apply broadly to all arrests for crimes for which no further evidence can be said to exist. Although our own circuit allowed a full search of the person incident to an arrest for vagrancy when it last considered the question in *Worthy,* the more recent Supreme Court decision in Chimel v. California, *supra* note 15, applying the scope limitation principle of *Terry, Sibron* and *Peters* to a search incident to arrest, casts grave doubts on the continuing validity of that holding. *See also* Hall v. United States, 148 U.S.App.D.C. 42, 46 n. 26, 459 F.2d 831, 835 n. 26 (1971) (*en banc*).

and unquestionable authority of law." Union Pacific Railway Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). The decision we render today protects both this individual right and the integrity of our criminal process.

Reversed.

BAZELON, Chief Judge, concurring specially:

I join in holding that the evidence in question must be excluded, and therefore this case must be remanded for retrial. Since I take a somewhat narrower view of the case than does Judge Wright, in his opinion for a plurality of the Court, I concur separately. I will state my reasons for limiting the issues and for my disagreement with the minority.

First, this is not a typical traffic offense arrest. The crimes for which Robinson was initially arrested carry large maximum penalties,[1] and the police regulations reasonably required that Officer Jenks take him into custody and transport him to the stationhouse.[2] The Court unanimously agrees that this alone justifies a surface pat down, of the kind described in Terry v. Ohio,[3] aimed at discovering indications that the arrestee has articles within his control that could be used to harm someone during the period of custody. The minority would justify this rule by upholding the reasonableness not of the search itself, but of the police "routine protective procedures." If the pat down is permitted by those "procedures" it would be sustained. I believe that the Supreme Court, in Sibron v. New York,[4] prohibited such an approach. Rather, as Judge Wright states,[5] the pat down is justifiable as reasonable to protect the officer from any inherent and imminent danger and to allow him to discharge his responsibility for the arrestee.

Second, I believe that all the members of the Court are in substantial agreement as to what a police officer must believe before he can remove an object he feels while conducting a surface pat down. Judge Wilkey's opinion for the minority approves a routine that allows "some flexibility based on the officer's perception of risk."[6] It thus appears that the minority agrees—as I do—with the plurality that an officer may remove an unidentified object from the control of the arrestee if he reasonably believes that his failure to do so would pose a danger to him, the arrestee, or others. Neither Judge Wright's nor Judge Wilkey's opinion suggests either that the officer must experience the emotional state of fear before he may take such action, or that he may remove anything he feels.

But whether Officer Jenks' state of mind satisfied this requirement of reasonable belief of danger is unclear, and the Court's disagreement about the constitutionality of the instant search appears to stem from different characterizations of the facts. Although the police department instructs its officers that they should conduct a "full search" automatically in such a situation,[7] and Officer Jenks testified that he "just searched" Robinson,[8] he later added that he "knew [the lump] wasn't cigarettes"

1. *See, e. g.*, 40 D.C.Code § 302(d) (1967).

2. *See* General Order No. 3, Series 1959, Metropolitan Police Department, April 24, 1959 (*quoted in* Plurality Opinion at 23 n. 23).

3. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

4. 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) (emphasis added):

 The inquiry under [the Fourth Amendment] may differ sharply from the inquiry set up by the categories of [the New York stop-and-frisk statute]. Our

constitutional inquiry would not be furthered here by an attempt to pronounce judgment on the words of the statute. *We must confine our review instead to the reasonableness of the searches and seizures which underlie these two convictions.*

 *Compare id.* at 70–71 (Harlan, J., concurring).

5. *See* Plurality Opinion at 1098.

6. Minority Opinion at 1119.

7. Remand Hearing Transcript 32.

8. *Id.*

because, being a crumpled package, it didn't feel like a cigarette pack through the jacket pocket.[9] One might fairly infer either that Officer Jenks formed no belief at all, or that, while somewhat inarticulate in describing it, he did perceive that trouble might arise later.

This uncertainty need not be resolved. With the crumpled package in the possession of Officer Jenks, he could not have had a reasonable belief that it would be dangerous. There is no claim that the external appearance of the package gave probable cause to believe that Robinson had committed another crime. The minority argues that this action was justifiable because inspection of any "irregular" object, after it has been removed from the arrestee's control, serves the "protective purpose" of the search.[10] I agree that every part of a protective search, except the physical act of removing an object from the arrestee's control, is a search for indicia that a weapon is present. In this sense, a protective search is a search for "evidence"—evidence probative of whether the individual has a weapon on his person. But to define the allowable scope of such a search by reference solely to whether the information sought is sufficiently probative of the existence of weapons would be to render scope limitations meaningless, and to miss the point of the exclusionary rule.

As the Supreme Court has said, there are many motives for police misconduct that the exclusionary rule will not affect.[11] The primary deterrable motive for misconduct in cases like that before us is the desire to discover contraband. To suggest, as the minority does, that searches of objects that have been removed from the control of the arrestee are less intrusive than the most thorough *Terry*-type pat downs, and should therefore be approved as reasonable under the Fourth Amendment, is to lump together types of conduct with widely differing potential for abuse.

We may debate which of these two types of search is the more intrusive in a given case. If we acknowledge this uncertainty, and then focus our exclusionary rule inquiry on the police motivation to discover contraband, we are not thereby suggesting that we view the purpose of the Fourth Amendment as the protection of possession of that contraband. Rather we direct the rule at the overreaching that it is designed to prevent. As Officer Jenks' testimony below demonstrates,[12] there is no substantial motive to engage in unnecessarily thorough *Terry*-type pat downs.

Insofar as these two search techniques are alternative means to the common end of protection, the police should be required to use the one less likely to conceal a search forbidden by the Fourth Amendment. Indeed, if the *Terry*-type pat down shows itself also susceptible of misuse, we might have to consider whether there are other available means for police protection. For now, it suffices for me that when an officer conducts a post-arrest, in-custody search for protective purposes alone, he may not

---

9. *Id.* 42.

10. *See* Minority Opinion at 1119.

11. *See* Terry v. Ohio, 392 U.S. 1, 13–14, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

12. Officer Jenks testified on cross examination as follows:
 Q. You are not aware of any police department regulation that prohibits you from putting your fingers inside a man's belt or probing in the groin area for weapons like this, are you?
 A. I don't go into a thorough search in that area.

Q. Do you know of any police department regulation that prohibits you from doing so?
A. No sir.
Q. So you could do exactly that, you could probe and feel into every part of my body where that weapon might be concealed?
A. No, not exactly. That is not fair.
Q. What would prohibit you?
A. I could hide that around my groin where it would be embarrassing to search for it?
Remand Hearing Transcript 41.

search objects that he has removed, or can reasonably remove, from the control of the arrestee.

---

No more is required to dispose of this case. I will, however, briefly indulge my own concern—not about other cases, but about one issue in this case that we may avoid only because we exclude the evidence. Defense counsel has never questioned whether the original "routine spot check" that alerted Officer Jenks to the age discrepancy in Robinson's identification was conducted in accordance with minimal constitutional requirements. While counsel did challenge, on disputed testimony, the scope of the subsequent inquiry into Robinson's documentary identification, he and the District Court apparently accepted as controlling authority [13] the decision of the District of Columbia Court of Appeals in Mincy v. District of Columbia, 218 A.2d 507 (1966), which held that such stops were not arrests, and thus were within the power of the police despite the absence of enabling legislation. That case, which of course is not binding on the District Court, did not squarely face the constitutional limitations on such procedures, and it antedated the Supreme Court's articulation in *Terry* of the Fourth Amendment's strictures on "all intrusions by agents of the public upon personal security." [14]

This record does not disclose the circumstances surrounding Officer Jenks' decision to stop Robinson.[15] The applicable police regulations, however, may conceivably be interpreted as hints encouraging the use of spot checks to conceal Fourth Amendment violations.[16] Although the officer is instructed to be prepared to articulate his reasons for the stop if questioned by the subject, the vague reasons suggested to him imply more than a routine check for license and registration documents. Additionally, the concept, if not the definition, of a spot check is that it is random—for example, pursuant to a formula of one vehicle in ten or fifty. It is the antithesis

---

13. Trial Transcript 42, 44–45, 62–63.

14. Plurality Opinion at 12 (citing Terry v. Ohio, 392 U.S. 1, 18 n. 15, 88 S.Ct. at 1878 n. 15 (1968)).

15. Trial Transcript 6–7 (Officer Jenks testifying):
 Q. Now, officer, please, state the circumstances under which you saw Mr. Robinson.
 A. He was operating a '65 Cadillac, D. C. registration, 653013 on U Street at 9th Street, Northwest. I was in a marked patrol car, and we stopped the vehicle for a routine spot check. . . .
 Q. For what purpose did you stop Mr. Robinson?
 A. Routine spot check, sir.

16. Metropolitan Police Department, Memorandum: Subject: Traffic Law Enforcement (June 9, 1964), states in part:
 A part of the program is to make "spot checks" of motorists with a view of [*sic*] detecting persons operating without a valid driving license. These checks are not in the form of "road blocks" and this memorandum shall not be construed as authorization to conduct "road blocks" for the purpose of examining the credentials of a driver. "Spot checks" shall generally be made in connection with some minor violations *or other suspicious circumstance.* (Emphasis added.) The problem apparently grows as information moves down through the police bureaucracy. Second District, Metropolitan Police Department Memorandum No. 237, "Traffic Check System to be used by members of the Second District in the prevention of crime," (December 18, 1969), states in part:
 This "Traffic Check" system, along with a more strict enforcement of the Truancy Laws and the Anti-Loitering Regulations, plus the effective use of the new "Stop and Frisk" rules, can be of invaluable aid to us in this field. There is no doubt that excellent results can be obtained if all members make a concerted effort with this traffic check system, using good police judgment and common sense in stopping and checking motorists in our area *under suspicious circumstances and/or at late and unusual hours.* . . . Members of this command must be tactful and courteous in these contacts and must be prepared to explain to the motorist the reasons for this check.
 (Emphasis added.)

of a stop based on reasons developed from the particular circumstances. Although the Court's exclusion of the evidence in this case makes it unnecessary to consider this matter, the responsible officials may find it appropriate to consider anew whether the spot-check procedures currently in use are consistent with the Fourth Amendment.

WILKEY, Circuit Judge, *dissenting*, with whom concur Circuit Judges TAMM, MacKINNON and ROBB: The search conducted in this case was reasonable in both justification and scope. Before proceeding to a detailed analysis, let us briefly put these two issues in perspective.

## A.

With reference to *justification* for the search, it must be realized at the outset that the frequent use of the terms "traffic violation" or "mere motor vehicle regulation" in the majority opinion serves only to confuse the analysis of what search was proper in this case with what would be proper in the circumstances of a truly "routine" traffic offense—such as running a stop sign, exceeding the speed limit, etc.—which all of us at one time or another may commit. Robinson did not inadvertently slide through a red light or creep above the speed limit; he had had his driver's permit revoked, he had obtained a new permit by deliberately falsifying his application, and he was operating a vehicle without a valid permit. One is a statutory offense defined by Congress, the other a violation of a District of Columbia ordinance—both carrying penalties of fines and up to 10 days in jail or up to one year's imprisonment.[1]

Under police regulations Officer Jenks could not permit Robinson to go on his way with a summons, as the ordinary citizen who had been guilty of only a truly routine traffic violation. Officer Jenks was obligated to arrest and take custody of Robinson as he would have a burglar or armed robber caught *flagrante delicto*.[2] Before the officer could take Robinson into custody in his patrol car, he was required by police standard operating procedure to search the man arrested.

## B.

So we have here a search justified by a full custodial arrest, not a "stop" for investigation, and a search whose scope is related to the problem of custody, not just a "frisk" for protection while an officer and suspect are conversing on the street.

With reference to *scope* of the search, let us also realize at the outset that the scope of the search involved here in no way remotely approached the outer limits of permissibility sanctioned by the Supreme Court in Terry v. Ohio[3] for a "frisk" after a "stop." The contraband heroin was found in the outer pocket of Robinson's car coat, not in an area of the body necessitating a highly objectionable invasion of privacy in order to discover it. This is the evidence the majority would order suppressed on the ground the search was *un*reasonable by Fourth Amendment standards. Since this search underlies Robinson's conviction—reconviction on a new trial without the heroin in evidence would be an impossibility—a brief review of the exact sequence of events is in order.

---

1. 40 D.C.Code § 302(d) (1967); Traffic Regulations of the District of Columbia § 157(e). The *minimum* penalties for the Congressional statute are equally significant—"not less than $100 . . . or imprison[ment] [for] *not less than 30 days*." A *minimum* of 30 days in jail is no routine penalty.

2. Metropolitan Police Department General Order No. 3, Series 1959 (24 April 1959).

3. "[T]he officer must feel with sensitive fingers every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet." 392 U.S. 1, at 17, note 13, 88 S.Ct. at 1877, note 13 (1968).

### C.

The arrest occurred at 11:10 p. m. in a not too well illuminated residential area in Southeast Washington. After the arrest, in accord with the practice employed in over three thousand prior arrests for such offenses,[4] Officer Jenks advised Robinson of his rights and began what is known in standard police parlance as a "field type search" for protective purposes incident to a "full custody arrest."[5] When Officer Jenks placed his hands on appellant's chest, he felt something in the outside left breast pocket of Robinson's "car coat." Because the coat was of heavy material, Officer Jenks could not determine either the size or the consistency of the object. In order to find out what the object was, he put his hand in appellant's pocket, which was open, and pulled out a "wadded-up" cigarette pack.

One thing was clear, this package did not contain cigarettes; Officer Jenks could feel "objects" inside, he still could not tell what it contained. He then opened the package and discovered that it contained gelatin capsules, later tested to be narcotics. After seeing the capsules, probably containing contraband, he put the package in his own pocket and continued the protective search.

4. Transcript of Proceedings before the Honorable William B. Jones, U. S. District Judge, on remand of Case No. 23,734 (U. S. Court of Appeals), 4 October 1971 (hereafter "Tr.") at p. 152. The description of the search throughout this opinion is taken generally from Officer Jenks' testimony at the hearing on remand and from the findings of the District Judge, Tr., pp. 99–100.

5. The standard procedure, followed in this case, was described at the hearing on remand by Sergeant Dennis C. Donaldson, a police instructor, Tr. 99–100.

6. E. Fisher, Search and Seizure (1970), at 90–91. See also Fisher, supra, Chapter I–G, Secs. 50–54, 47 Am.Jur., Searches and Seizures, Sec. 19; 5 Am.Jur.2d, Arrest, Sec. 73; 79 C.J.S. Searches and Seizures §§ 67(a), 68(a), 69(a) ; Notes, 82 A.L.R. 782, 74 A.L.R. 1387, 51 A.L.R. 424, 32 A.L.R. 680: "Right of search and seizure incident to lawful arrest, without a search warrant"; Note, 169 A.L.R. 1419: "Search incident to one

### I. *A Search Incident to Arrest was Permissible Here*

### A.

The search conducted in this case must be tested against the long-established doctrine upholding the constitutionality of a warrantless search incident to a lawful arrest. In a recent treatise, the general rule concerning such searches was aptly stated as follows:

> [U]pon a search incident to a lawful arrest the police may search for and seize weapons by which the prisoner may injure the officers or others or effect his escape, incriminating articles connected with the crime as its fruits or the means by which it was committed, also stolen property and other items which it is unlawful for the prisoner to possess, i. e., contraband. In connection with such a search the officers may seize not only evidence tending to establish the crime for which the arrest is made but also evidence of other crimes.[6]

Such searches incident to arrest are extremely common, outnumbering manyfold searches covered by warrants, a fact which is usually ignored or misstated.[7] Probably the practice is "as old as the institution of arrest."[8]

offense as justifying seizure of instruments of or articles connected with another offense."

7. Judge Wright's opinion here states the usual flat error regarding the established facts. *"Ordinarily,* a warrant must be obtained by a police officer before he may make a search" (p. 1090). "Ordinarily" just isn't true. See Telford Taylor, Two Studies in Constitutional Interpretation (1969), at 48–49. In 1966, the New York police obtained 3,897 search warrants and made 171,288 arrests (of which only 366 were made pursuant to an arrest warrant). Statistics from other cities are comparable. American Law Institute, Model Code of Pre-Arraignment Procedure, p. 157 (Proposed Official Draft No. 1, 1972). The only possible inference from these figures is that, as a practical matter, searches incident to arrest (as opposed to those with warrants) play the vastly predominant role in police practice.

8. Taylor, *op. cit.* at 28.

The constitutionality of such a procedure cannot be seriously challenged.[9] Particularly with regard to the protective purpose of such a search, the absence of a warrant is justified by the emergency created by the arrest itself. Indeed, it has been suggested by a noted scholar that the framers of the Fourth Amendment's search provision considered immediate search of an arrestee inherently reasonable, and viewed the warrant as a not entirely satisfactory way of regulating those searches which might be unreasonable because they did not accompany a valid arrest.[10]

### B.

The search conducted in this case clearly fits within this general doctrine of search incident to arrest. Without question, this was a valid arrest. It is also clear that the arrest in this case was not a mere pretext for the search.[11] Officer Jenks was not a narcotics officer who manufactured a reason for the arrest in order to establish grounds for a warrantless search for suspected contraband. To the contrary, he had a special interest in the exact type of arrest made in this case.[12] He was legitimately interested in tracking Robinson down for driving after revocation. Since the arrest originated with this valid pur-

pose, and was legally consummated, the search must be viewed as having been incident to the arrest rather than the reverse.

Further, this search was in fact undertaken with the permissible purpose of protecting both the officer and the prisoner from the potential of violent use of concealed weapons. Officer Jenks testified that he understood that protection was the major reason police standard operating procedures require a search in these circumstances.[13] He knew that small deadly weapons could be concealed on Robinson's person. Indeed, he vividly recalled an instance in which a fellow officer was cut by a prisoner's razor blade which had gone undetected during an arrest.[14]

Although the record does show that Officer Jenks took steps to "control" the prisoner[15] and understood the protective purpose of this routine search, there is no explicit indication that he was ever actually in fear of violence from Robinson. However, a purely subjective test of the presence or absence of personal fear on the part of the arresting officer does not determine the constitutional validity of this search incident to arrest and custody.

It is true that in examining the permissible grounds for a limited search

9. The rule which allows a search incident to an arrest, as a "reasonable" one under the Fourth Amendment, has been stated by the Court many times and followed by the state appellate courts "in innumerable instances." Fisher, *supra*, note 6, at 177. See, *e. g.*, Sibron v. New York (Peters v. New York), 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L. Ed.2d 668 (1960); Draper v. United States, 358 U.S. 307, 314, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Rabinowitz, 339 U.S. 56, 65–66, 70 S.Ct. 430, 94 L.Ed. 653, disapproved on another point in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145

(1925); Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

10. Taylor, *op. cit.* at 39–41.

11. Judge Wright accepts this fact at footnote 3 of his opinion.

12. Tr., pp. 11 and 13.

13. Tr., p. 32.

14. The District Judge found that "prior to April 23, 1968 [the date of Robinson's arrest], Jenks . . . knew of a police officer being cut by a razor blade in the hands of one arrested while the officer and the arrested person were at a police call box." Tr., p. 153. Officer Jenks testified that the case "will always stay in my mind because of the outcome of what happened to the officer." Tr., p. 29.

15. Tr., p. 16.

*without arrest,* a "stop and frisk," the Supreme Court in Terry v. Ohio set out a requirement that there be actual, articulable fear of danger.[16] Robinson is not a "stop and frisk" situation; the *Terry* test with reference to fear as a predicate or justification for search does not apply because there was a valid arrest in Robinson's case. However, the rationale of *Terry* does support this search. According to *Terry,* one of the factors which may be considered in testing the reasonable need for a protective search is an anticipation of danger based on the officer's experience.[17] The fact of Robinson's arrest, not any subjective feeling of fear by the individual officer, brought this case under police procedures requiring a protective search. These standardized procedures represent the distillation of the experience of the entire police force, not just that of a particular officer. That experience obviously produced the reasonable inference that the act of custodial arrest itself, such as we have here, does create a potentially dangerous situation, and strict regulations were devised and promulgated to deal with it.

The training of a police officer, like the training of a soldier, must be designed to maximize simplicity, clarity of instructions, and standardization of procedures. For his own protection the soldier is taught to do things instinctively; he is drilled repeatedly in certain procedures until even in times of great stress he reacts automatically by doing the correct thing. In part, the same is true of the police officer; he is taught certain standardized procedures for his own protection, so that in time of stress he will instinctively take the correct action.[18]

For a police officer, the "correct action" is designed not only to protect the officer, and other persons, but to prevent unjustifiable intrusions into citizens' private affairs. While search and seizure cases are frequently viewed as the classical confrontation of the rights of the individual versus the rights of society, I cannot stress this too strongly: The uninstructed individual judgment of each policeman on every situation *ad hoc* is likely to result in more violations of individual rights than will obedience to carefully prescribed standard procedures.

Indeed, the availability of such standard operating procedures, based on a reasonable general inference, may well be exactly what helped keep fear from interfering with Officer Jenks' effectiveness. We should not let the fact that an officer was operating in accordance with routine protective procedures, rather than out of personal fear, become the factor determinative of the reasonableness of his actions. To the contrary, this circumstance merely changes the question which faces the court from the reasonableness of the officer's suspicions to the reasonableness of the protective routine he followed.

Focusing on the reasonableness of the routine serves the valuable function of providing a more objective standard for judicial review and police guidance. Illusive and unreliable inquiry into the officer's emotional state would be avoided. The difficult inquiry into emotions may be necessary in *Terry* situations where it is the only available test of reasonableness. In contrast, this routine search incident to custodial arrest more nearly resembles the case of an officer acting pursuant to the guidelines set forth in a search warrant. No *personal* suspicion of the presence of evidence is required of the officer, if he stays within the pre-set limits, in such situations. The *prior* determination of reasonable

---

16. Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

17. *Ibid.*

18. Sergeant Donaldson testified that officers are taught to conduct an automatic routine protective search. They are discouraged from endangering themselves and others by pausing to weigh all the possible technical questions and probabilities during the stressful and potentially dangerous period of arrest. Tr., pp. 103–106.

grounds to search and of the reasonable scope of the search is what is at issue.

## C.

Judge Wright's opinion rests on the proposition that, regardless of actual police practice or regulations, *any* search incident to a "routine traffic arrest" is, absent special circumstances, unreasonable.[19] Given the large number of police injuries which have accompanied what at first appeared to be routine automobile stops, I do not accept that proposition.[20] Furthermore, although this was a traffic arrest, it was not minor; it was for a serious offense, and the majority opinion at footnote 18 so admits. Aside from these two arguments, more convincingly and to the point, a careful analysis of the possible rationales for a limit on searches incident to minor traffic arrests makes it clear that this particular arrest and search does not fall within any such limited rule.

To brush aside the argument usually first advanced, the fact that most traffic offenses, as is true of this one, have no fruits or instrumentalities justifying an evidentiary search is simply irrelevant. This was not an evidentiary search.[21] It cannot therefore be either justified or condemned because there was no potential for the discovery of evidence.

Another argument for prohibiting searches incident to traffic arrests is the temptation to use such minor infractions, of which anyone may be guilty at some point, as a pretext for the search which follows. However, unlike speeding, driving after revocation is not the sort of offense which is so common that it could readily serve as a vehicle for pretextual arrest. In addition, as discussed above, there is absolutely no basis for concluding that this arrest was in fact pretextual.

A third argument suggests that since minor traffic arrests are so numerous, accompanying searches would create intense community resentment. If conducted in all such cases, the searches would be viewed as unnecessary harassment. If conducted only in some cases, with the search justified by arrest rather than the grounds outlined in *Terry*, the searches would probably create a suspicion, whether or not justified, of discriminatory harassment. However, it must once again be remembered that the offense prompting the arrest here, driving after revocation, is not a common or insignificant offense.[22] It is a serious crime for which, according to standing police orders, the suspect must be placed

---

19. See People v. Simon, 7 Cal.3d 186, 101 Cal.Rptr. 837, 496 P.2d 1205 (Cal.Sup. Ct.1972) (*en banc*) for another recent expression of this argument.

20. The Supreme Court has recently noted that approximately 30% of the 120 policemen who were murdered by killers wielding guns died as a result of the police officers' approaching a suspect seated in an automobile. Adams, Warden v. Williams, 407 U.S. 143, at 148, note 3, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Further, the International Association of Chiefs of Police in their Annual Law Enforcement Casualty Summary for July 1970 to June 1971 report that during that period 61 casualties were sustained by police officers responding to or handling traffic problems, and an additional 100 officers sustained injuries in the course of making traffic arrests, Annual Law Enforcement Casualty Summary, figure 9, at p. 12. Taking into account these observations, it is difficult to disagree with the conclusion reached by the International Association of Chiefs of Police in their Summary, that "The innocuous traffic stop, a routine activity for most police officers, remains a major police fatality category. The killing of eleven officers engaged in traffic activity during the period attests to the potential for danger present in this activity." *Id.* at 27.

21. The Government has abandoned the argument that Officer Jenks might have found that notice of revocation which had been sent to Robinson many years before this arrest.

22. See footnote 24 and the accompanying text.

under full custody arrest.[23] A grave loss of liberty is inevitable. The further intrusion of a limited search could hardly add significantly to Robinson's sense of resentment. And because the offense is rare and serious, the consequences he suffers will not become commonplace.

Finally, and most importantly, a rule barring searches in the context of minor traffic offenses essentially rests on the conclusion that no reasonable inference of danger can be drawn in such instances. That is simply not true in this case, and the court's entire position, invalidating this protective search, rests on the false premise that there was no reason for protection.

That premise is false for two principal reasons: First, although the nature of the offense here may not in itself demonstrate a propensity to aggressive violence, its seriousness does indicate that the arrestee will have a strong motive to escape from arrest. The Congress provided that driving after revocation can be punished by a fine of as much as $500, a year in jail, or both.[24] In addition, the deliberate commission of one such serious offense does reasonably suggest the possibility that the suspect may have other strong reasons for wanting to avoid police custody.

Second, as noted above, a police General Order requires that one suspected of driving after revocation must be placed in full custody arrest and taken to the police station. This procedure, reasonable in itself because of the likelihood that the suspect will not respond to a mere citation, necessarily placed the officer in proximity to his prisoner for a considerable period of time. It must be distinguished from the very brief encounters associated with either a *Terry* stop or a normal traffic citation. Both

a strong motive to escape and prolonged contact obviously raise the danger that the prisoner will be willing and able to reach concealed weapons and use them against the officer.

In short, whatever reasons there may be for a rule barring searches incident to minor traffic arrests, those reasons constitute no logical, relevant rationale on which to invalidate a protective search following apprehension for a serious offense, involving custody of a possibly armed prisoner, which we admittedly have here.

II. *The Search Was Reasonable in Scope*

Having concluded that a protective search was justified under these circumstances, I would also hold that this particular search did not go beyond the permissible scope of an inquiry supported by this justification.

The withdrawal of the cigarette pack from Robinson's pocket was clearly permissible. Beginning with the least intrusive step possible, a "pat down" of Robinson's outer clothing, Jenks came upon an object which *could* have been a concealed weapon. Jenks could not tell exactly what the object was. But testimony of a concealed weapons expert at the remand hearing makes it clear that a great many deadly or incapacitating weapons could have been concealed in a pocket the size of Robinson's in such a way that the pat down could have discovered their presence but could *not* have revealed whether they were weapons, or indeed whether they were hard or soft. In an amazingly graphic demonstration the expert showed that he had concealed upon his person twenty-five weapons "that could kill or incapacitate."[25] It should be noted that one of the weapons produced, a .22 pistol

23. General Order No. 3, Series 1959, Metropolitan Police Department, 24 April 1959. The General Order is reproduced in part in Judge Wright's opinion at footnote 23.

24. 40 D.C.Code § 302(d). This offense was created by an Act of Congress, and therefore must be distinguished from most traffic offenses, which are only set out in regulations promulgated by the District of Columbia City Council and approved by the Mayor-Commissioner. See 40 D.C.Code § 603.

25. Tr., p. 61. See Judge Wright's footnote 28.

made from a small aluminum tube, was in fact concealed in a cigarette package.

Even after Jenks was able to feel the size and texture of the cigarette pack inside the pocket, his remaining uncertainty was legitimate. He could have squeezed the pack while it was still in Robinson's pocket. But all that would have told him was that the "objects" inside were definitely not cigarettes. The possibility remained that they were any number of harmful objects, from small blades to live bullets. That possibility is exactly what the routine protective search procedure was designed to eliminate.

With the question of potential danger unresolved, Officer Jenks' withdrawal of the package from the pocket was entirely necessary and proper. As previously stated, the tests established under *Terry* do not necessarily apply here. But both "frisks" and this search incident to arrest share a protective purpose. Since the risk of violence is probably greater in the case of a full custody arrest than it is in the case of a *Terry* stop, the search here should be allowed to be at least as thorough. So it is significant that Jenks' action would be permissible even if the standards established in *Terry* did apply.[26]

To be safe, the arresting officer must not only discover potential weapons but also confirm the dangerous nature of the weapon and disarm the arrestee. A pat down would be totally worthless if the arresting officer were prohibited from going further once he had discovered the possibility of unknown danger. A requirement of absolute certainty as to the existence and nature of a weapon before the officer could explore further would assure that any cleverly disguised device remained in the prisoner's control.

### B.

It also follows that the opening and inspection of the cigarette pack was within the permissible scope of a reasonable protective search incident to arrest. It is established that a search can only remain allowable if each part of the procedure is reasonably related in scope to the justification for its initiation.[27] This last phase of the search meets that test.

Even when the cigarette pack was visible, the nature of its contents remained unresolved. It could have contained weapons.[28] It clearly did not appear to contain cigarettes. Of course, since the package was now in the officer's possession, any risk of the prisoner's use of a weapon in this package had been eliminated. But further inspection of the package was still justifiable as a protective measure. If the package *had* contained a razor blade, or live bullets, the officer would have been alerted to search Robinson much more thoroughly since the possibility of there being other weapons concealed on his person would increase.

It is highly important to note at this point that Officer Jenks' peek into the cigarette pack had the same purpose and function as every other step in the pat down. Initially, when the arrestee stands before the officer, he contains a potential for danger, quantum unknown. The officer's prescribed search routine is designed first to discover and then to eliminate that potential for danger. He has the right, unquestioned by the ma-

---

26. The Court in *Terry* specifically notes that the officer did not and should not go beyond the outer surfaces of the arrestee's clothing *if "he discovered nothing in his pat-down which might have been a weapon."* 392 U.S. 1, 30, 88 S.Ct. at 1884 (emphasis added). The presence of actual uncertainty in the face of warning signs is the line that distinguishes a legitimate protective "frisk" in the stop situation from a general exploratory

search. See also Sibron v. New York, 392 U.S. 40, 67, 88 S.Ct. 1889, 20 L.Ed. 2d 917 (1968).

27. Terry v. Ohio, 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

28. The District Judge found that the crumpled up cigarette package could have contained a razor blade. Tr., p. 155. See footnote 25 above.

jority here, of making the type search authorized by the Supreme Court in *Terry* in a stop-and-frisk situation. In a full custody arrest situation, Robinson's case, the officer can legitimately be even more thorough, the exact scope depending on the indicia of danger he encounters in his search.

With the possible exception of *confiscation* of a *discovered* weapon, everything the officer does during a pat down is aimed at discovering indicia of potential danger. Jenks' routine was designed *both* to neutralize the individual weapons discovered *and* to obtain their warning that other potential danger might be present. The fact that the potential weapon in the cigarette pack has been removed from the arrestee's control simply does not destroy its function, shared with that of additional indicia for which the officer can clearly continue to look, as a clue to further danger.

When Officer Jenks found the cigarette package—which clearly did not contain cigarettes—the basic overall question he had set out to answer was still unresolved, what potential danger did the prisoner in custody represent to Jenks and others? If the cigarette package had appeared to contain cigarettes, on these facts alone in this case, Jenks might have been unjustified in opening the package, his inquiry in this sector would have been satisfactorily resolved.[29] But it was certain the package contained something else besides cigarettes, Jenks knew from his training it could have been one of several different type weapons, the potential of danger—the original motivating question of the whole protective search—could not be resolved without looking into the package, and so he did.

This action flowed logically and naturally from the whole rationale of a protective search, and was as completely justified as initiating this protective custodial-arrest search originally.

Officer Jenks specifically testified that the nature and scope of his protective searches varied depending on how he perceived the risk.[30] When the mysterious package was found, Jenks was conducting a face-to-face search of the type used when less danger is perceived. Discovery of one weapon would very likely have prompted the protective measure of turning Robinson around and placing him with his hands against a wall or the car for a more thorough "pat down" search. Thus, the potential contents of the package were highly relevant to Jenks' legitimate self-protective purposes. Since the cigarette package gave notice of irregular contents, and could have revealed hidden danger, Jenks' inspection, and the routine commanding it, should be held to fall fully within the justifiable scope of a protective search.

The routine Officer Jenks followed here allows some flexibility based on the officer's perception of risk, and this we should approve. Such procedures may well spare those who legitimately appear harmless from the indignities of as full a search as might be permissible in any given instance. However, that sort of flexibility would be impossible unless the officer's routine allows investigation of the unusual and suspicious in order to

---

**29.** There is an indication in the testimony of Mr. Newhouser, the weapons expert, that standard police practice in fact draws this sort of line and would not command further inspection, or even removal, of what appeared to be a regular cigarette package. Tr., pp. 79–80. To the extent that standard police procedure might counsel a broader search, such as inspection of regular-appearing objects after their removal from the arrestee, that routine would be suspect. Contrary to Judge Wright's suggestion at his footnote 9, Officer Jenks was not conducting that sort of "full" search here. Rather, he was following up the clue provided by an unusual object. Starting with the overall regular appearance of any given arrestee, an arresting officer must of necessity progressively narrow the focus of his inquiry by glossing over what appears normal and satisfying himself with respect to objects, the appearance of which he *cannot explain*, but which *could* contain clues of danger.

**30.** Tr., p. 28.

determine what level of risk in fact exists. In short, the officer should not be allowed to manufacture, nor should he be forced to ignore, those alert signals which indicate what degree of thoroughness will produce adequate protection.

### III. *Conclusion*

I reach my conclusions in this case on the basis of several fundamental propositions concerning the application of the exclusionary rule which deserve explanation. Exclusion of admittedly probative evidence represents a sacrifice of the social values of accurate judicial decision-making and punishment of the discovered crimes. This sacrifice is made in order to deter unreasonable intrusions by the police. Any application of the exclusionary rule must necessarily take this conflict of values into account. The offensiveness of the intrusion and the likelihood of its being deterred must be balanced against the sacrifice to truth and law enforcement.[31]

We should be mindful, therefore, that the case before us involves a type of intrusion far less offensive to the average person than would be the inspection of private papers or the thorough search of a home. Indeed, Jenks' peek into Robinson's cigarette pack is a far cry from what *Terry* allows, even without the added dangers stemming from a full custody arrest. In *Terry* the Court described a permissible "frisk" in these terms:

> [T]he officer must feel with sensitive fingers every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet.[32]

It is utterly inconceivable to me that Judge Wright can take this as the accepted standard for a permissible "frisk"—but take it they must because this is the Supreme Court's standard—and yet hold impermissible Officer Jenks' search of the contents of the *outer* pocket of Robinson's car coat, a protective search made after arrest by the

---

31. Chief Justice Burger has said that

> The deterrence theory underlying the Suppression Doctrine, or Exclusionary Rule has a certain appeal in spite of the high price society pays for such a drastic remedy. Notwithstanding its plausibility, many judges and lawyers and some of our most distinguished legal scholars have never quite been able to escape the force of Cardozo's statement of the doctrine's anomalous result:
>
>> The criminal is to go free because the constable has blundered. . . . A room is searched against the law, and the body of a murdered man is found. . . . The privacy of the home has been infringed, and the murderer goes free. People v. DeFore, 242 N.Y. 13, 21, 23–24, 150 N.E. 585, 587–588 (1926).
>
> \* \* \* \* \*
>
> Suppressing unchallenged truth has set guilty criminals free but demonstrably has neither deterred deliberate violations of the Fourth Amendment nor decreased those errors in judgment that will inevitably occur given the pressures inherent in police work having to do with serious crimes.
>
> \* \* \* \* \*

> I believe the time has come to re-examine the scope of the exclusionary rule and consider at least some narrowing of its thrust so as to eliminate the anomalies it has produced.

Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, at 413, 418, 424, 91 S.Ct. 1999, 2013, 2015, 2018, 29 L.Ed.2d 619 (1971) (dissenting). What we should do here is to apply existing principles deduced from the decided cases and the fundamental rationale of the Fourth Amendment, leaving to the Chief Justice and his Associate Justices the task of "reexamin[ing] the scope of the Exclusionary Rule." What we should *not* do in the face of the Chief Justice's and others' widely expressed dissatisfaction with the broadened scope of the Fourth Amendment and the Exclusionary Rule is to narrow further the scope of what is a "reasonable" search and thus augment the impact of the Exclusionary Rule.

32. 392 U.S., at 17, note 13, 88 S.Ct. at 1877 n. 13. The description is taken from Priar & Martin, Searching and Disarming Criminals, 45 J.Crim.L.C. & P.S. 481 (1954).

officer alone at 11:10 p. m. as a prelude to taking custody and transporting the prisoner.

If we accept the *Terry* standard of constitutional "reasonableness" for a "stop and frisk" situation, Judge Wright's holding that the step-by-step search after arrest of Robinson's open outside breast pocket was *un*reasonable seems to me logically indefensible. Here

we can profitably revert to the fundamental principle that the Fourth Amendment condemns only *un*reasonable searches. If a probing of a person's most sensitive and private areas can be justified for protective purposes, the outer pocket of a car coat (whether specifically listed by the Supreme Court or not) should be considered within the orbit of reasonable search for that same protective purpose.[33]

33. I must respectfully suggest that Judge Wright's opinion seriously misconstrues the American Law Institute position on searches like that of Robinson. Judge Wright asserts "the American Law Institute concludes that a police officer may not conduct a full search of an individual arrested for 'a traffic offense or other misdemeanor, the elements and circumstances of which involve no unlawful possession or violent, or intentionally or recklessly dangerous, conduct. . . . ' And this is so whether or not the offender is taken into custody." The omitted part of ALI Search and Seizure, Section 230.2, reads: *Provided,* That this Section shall not be construed to forbid the search for dangerous weapons authorized by Section 110.2(4) of Part I if the circumstances described in Section 110.2(1) thereof are present at the time of the arrest." Section 110.2, *Stopping of Persons,* (1) *Cases in Which Stop Is Authorized,* is not applicable here, because the circumstances described therein deal with justification for a "stop and frisk," whereas in Robinson's case we have a custodial search after an admittedly lawful arrest. Section 110.2(4) is somewhat illuminating but not directly applicable either:

(4) *Frisk for Dangerous Weapons.* A law enforcement officer who has stopped any person pursuant to this section may, if the officer reasonably believes that his safety or the safety of others then present so requires, search for any dangerous weapon by an external patting of such person's outer clothing. If in the course of such search he feels an object which he reasonably believes to be a dangerous weapon, he may take such action as is necessary to examine such object. This of course is virtually the *Terry* standard for a "frisk" after a "stop." As made clear above, logically one cannot *accept* the scope of the "frisk" after a "stop" permitted by the *Terry* standard and *reject* the scope of the full custodial search for protective purposes after arrest made of Robinson here.

But if the majority wishes to resort to American Law Institute standards to sustain its holding that the cigarette package of heroin capsules should be suppressed as evidence at the trial, I suggest resort to Section 290.2, Determination of Motions to Suppress Evidence of that same ALI Code of Pre-Arraignment Procedure:

(2) *Determination.* A motion to suppress evidence shall be granted only if the court finds that the violation upon which it is based was substantial, or if otherwise required by the Constitution of the United States or of this State. In determining whether a violation is substantial the court shall consider all the circumstances, including:

(a) the importance of the particular interest violated;

(b) the extent of deviation from lawful conduct;

(c) the extent to which the violation was willful;

(d) the extent to which privacy was invaded;

(e) the extent to which exclusion will tend to prevent violations of this Code;

(f) whether, but for the violation, the things seized would have been discovered; and

(g) the extent to which the violation prejudiced the moving party's ability to support his motion, or to defend himself in the proceeding in which the things seized are sought to be offered in evidence against him.

The inspection of the cigarette package contents from the outer pocket of Robinson's car coat could hardly be termed a "substantial" violation, especially when ranged alongside the permissible limits of invasion of privacy set forth by the Supreme Court in *Terry.* But this question deals with the Exclusionary Rule, and this dissent does not rest on the question of the applicability of the Exclusionary Rule, rather on the premise that by accepted standards the search of Robinson should be held "reasonable" under the Fourth Amendment.

We should also be mindful that the exclusionary rule's primary goal, deterrence, will not be well served by the decision that this search was unreasonable. If society highly values the safety of its police officers, they probably and understandably value it even more. Limits to their self-protective routines must, of course, be drawn; but it is one thing to ask the officer to pass up evidence and quite another to ask him, by foregoing a minimally intrusive technique, to expose himself to a greater and very real risk of bodily harm.

Finally, we should be aware that a primary flaw in the development of the exclusionary rule has been a continuing abstraction of analysis which puzzles judges in their chambers and requires a hairline constitutional analysis literally impossible of application by the officer in the field. Many police departments have attempted to deal with this problem by training their officers in a set routine, which has evolved from both court decisions on the limits of allowable search and police experience with (among other things) the risks inherent in different situations. This dissent has stressed that this is a sound approach which will tend to minimize intrusion into individual privacy (much more than would a policy of *ad hoc* individual judgments espoused by Judge Wright) while maximizing safety for all society.[34]

The fact that Officer Jenks was following routine police procedure of course *does not validate either the decision to search or the scope of the search.* The reasonableness of that routine itself

is precisely what this court must consider. What the presence of the routine does provide is a shift in the focus of the court's inquiry from the personal fear of the officer to the codified judgment of his superiors—the established routine as followed in this case.

Officer Jenks' statement that he "just searched him," which seems highly important to Judge Wright's opinion, must be viewed in light of other testimony indicating that the absence of personal fear of danger resulted from the very fact that such protective searches had actually become routine for this officer. The record shows that Officer Jenks knew this search routine was for protective purposes. Viewed in that light, he was not indulging in mere "curiosity" but "routine curiosity with a protective purpose."

Since the fact of custodial arrest and the protective purpose present here validate the decision to search, the valid scope of the search is the other issue to be considered. The look inside the cigarette pack, commanded by routine, served a protective function which must be weighed against its intrusiveness. Indeed, as emphasized above, Officer Jenks' peek had the same purpose as every other step in a pat down—discovering indicia of potential danger. Here, as I have set forth the rationale of a constitutionally "reasonable" search, the physical perceptions of the officer, as opposed to his subjective emotional state, become important. He had legitimately come across an unusual and irregular object—the precise nature of

34. Judge Wright's opinion throughout is based on a subjective approach, i. e., whether the officer actually felt fear and acted on that in making the search. In so doing, I submit Judge Wright interjects the *Terry* requirements for a "stop and frisk" into a full custodial arrest situation, which is quite different, and which I urge can best be handled by a more objective, standardized routine approach. I say "best", and I mean "best" for society, the officer, and the individual apprehended. But even if we should decide Robinson's case on the subjective standards of Judge Wright, what is reasonable in this case must in great part be judged through the eyes of a police officer, alone on a lightly traveled street at 11:10 p. m., not from the vantage point of anyone in an acadamic or judicial sanctuary. If hairline constitutional distinctions cause judges to divide 5–4 in their opinions, the police officer on the line, operating in accord with prescribed standard procedures, should get the benefit of the doubt, not the criminal with capsules of heroin boldly carried in his outer pocket.

which he could not determine. The object could have contained weapons—the discovery of which would counsel further protective measures. A police routine designed to guide appropriate action when doubt is present could counsel one of two actions at that moment. It could require that he always assume the worst and immediately spread-eagle the arrestee during the rest of the pat down. Here, it instead suggested further examination of the irregular object. In addition to being the natural human response, this course avoids unnecessary and embarrassing spread-eagle searches. It is minimally intrusive on the arrestee's right to privacy. That right of privacy, not the right to conceal contraband, is what the Fourth Amendment protects.

I conclude that the search conducted by Officer Jenks under such a standard operating procedure falls within the permissible scope of any reasonable self-protective search routine.

Robinson's conviction should be affirmed.